**COMMONWEALTH of Pennsylvania Appellant**

v.

**Edil G. ROSAS Appellee.**

**Commonwealth of Pennsylvania Appellant**

v.

**Luis S. Brito Appellee.**

Superior Court of Pennsylvania.

Submitted Dec. 24, 2004.
Filed May 19, 2005.

Jaime M. Keating, Assistant District Attorney, Carlisle, for Commonwealth, appellant.

Kara W. Haggerty, Carlisle, for Rosas.

H. Anthony Adams, Carlisle, for Brito.

Before: BENDER, PANELLA, and MONTEMURO *, JJ.

OPINION BY PANELLA, J.:

¶ 1 The Commonwealth appeals from the orders[1] entered on June 28, 2004, and July 1, 2004, by the Court of Common Pleas of Cumberland County, which granted the suppression motions of Appellees, Edil Gonzalez Rosas and Luis Santiago Brito.[2] The result was the suppression of approximately two (2) ounces of cocaine seized from a vehicle in which Rosas was driving and Brito was the passenger. After careful review, we reverse.

¶ 2 On November 8, 2003, Pennsylvania State Police Trooper Bryan Henneman was "running radar" on Interstate 81 in Cumberland County when the radar showed a vehicle traveling 82 miles per hour in a 65 mile per hour zone. Shortly thereafter, Trooper Henneman conducted a traffic stop of the vehicle. Upon approaching the vehicle, Trooper Henneman requested the driver, Rosas, to produce his driver's license, proof of insurance, and registration. Rosas, however, was unable to produce any of the three requested items, but did provide Trooper Henneman with a social security card. Rosas was also unable to provide a home address, supplying only the name of a town, i.e., Moorefield. Trooper Henneman also requested Rosas's date of birth.

¶ 3 Armed with Rosas's name and date of birth, Trooper Henneman conducted a license check on his in-car computer. Using his computer, Trooper Henneman checked Rosas through the National Crime Information Center (NCIC)[3] and received information which indicated the possibility that Rosas may have been a deported felon wanted for immigration violations. The name on the NCIC report, however, was Jose Angel Gonzalez, and the report also noted that Jose Angel Gonzalez was also known by 34 aliases, none of which was Edil Gonzalez Rosas. The NCIC report noted at least two birth dates for Jose Angel Gonzalez, one of which matched the birth date provided by Rosas. Trooper Henneman also discovered that the vehicle

---

* Retired Justice assigned to the Superior Court

1. This Court consolidated these appeals *sua sponte* on April 22, 2005.

2. These appeals are permissible as the Commonwealth has certified in good faith that the suppression orders submitted for our review substantially handicap the prosecution and the appeals are not intended for delay purposes. *See* Pa.R.A.P., Rule 311(d), 42 PA.

CONS.STAT.ANN.; *Commonwealth v. Dugger*, 506 Pa. 537, 486 A.2d 382 (1985).

3. Trooper Henneman testified that he could not precisely remember the date which Rosas provided as his birth date, but that it was one of the dates, probably March 16, 1978, that were used for the computer search and indicated on the data sheets.

was registered to a woman in West Virginia.

¶ 4 After receiving the information from the NCIC, Trooper Henneman requested backup, after which, Trooper Daniel James Housel responded. Upon Trooper Housel's arrival at the scene, Trooper Henneman placed Rosas in handcuffs and informed him that he was being detained because he was coming up on the NCIC as a deported felon. Trooper Henneman noted that Rosas was then placed between a patrol car and his vehicle while the passenger, Brito, remained seated in the vehicle.

¶ 5 Thereafter, Trooper Henneman testified that he observed, through the vehicle's rear glass hatch, an upside down license plate. Trooper Henneman asked Rosas whether he could enter the vehicle and "retrieve" the license plate and Rosas consented to the search. Because by this time the passenger, Brito, had exited the vehicle, Trooper Housel testified that he entered the vehicle through the passenger side, leaned the passenger seat forward, and reached into the back seat. According to Trooper Housel, he had to "move stuff" so that he could reach the back of the vehicle and that "[u]pon moving the stuff" he observed "a little plastic grocery bag sitting on the back seat," which he testified contained "what appeared to be cocaine or crack cocaine." Once the bag containing the cocaine was discovered, the passenger, Brito, was immediately placed into custody and both men were taken to the station for processing.

¶ 6 Rosas was subsequently charged with possession with intent to deliver a controlled substance,[4] possession of a con-

trolled substance,[5] and speeding.[6] Brito was charged with possession with intent to deliver a controlled substance[7] and possession of a controlled substance.[8] Rosas and Brito each filed timely motions to suppress evidence.

¶ 7 The suppression court held a hearing on Brito's suppression motion on May 6, 2004. The suppression hearing was very brief, consisting of a mere nine pages of testimony. Following the hearing, on May 19, 2004, the suppression court denied Brito's suppression motion.

¶ 8 On June 16, 2004, the suppression court conducted a hearing on Rosas's suppression motion, after which the court granted the motion. The suppression court noted that based on the NCIC report, "Trooper Henneman did not have reasonably, trustworthy information constituting probable cause to believe that [Rosas] . . . was Jose Angel Gonzalez. . . ." As such, the suppression court concluded that "the search of the vehicle by consent occurred after defendant was arrested without probable cause," and thus, granted the motion.

¶ 9 On June 29, 2004, Brito filed a motion for reconsideration of the suppression court's ruling. The basis for Brito's motion for reconsideration was predicated upon the testimony elicited during the suppression hearing held on Rosas's suppression motion on June 16, 2004. The suppression court granted Brito's motion for reconsideration on July 1, 2004, vacated its prior order, and consequently granted Brito's suppression motion.

¶ 10 These timely appeals followed.[9] In both cases, the Commonwealth argues that

---

**4.** 35 PA.STAT. § 780–113(a)(30).

**5.** 35 PA.STAT. § 780–113(a)(16).

**6.** 75 PA.CONS.STAT.ANN. § 3362(a)(1.1).

**7.** 35 PA.STAT. § 780–113(a)(30).

**8.** 35 PA.STAT. § 780–113(a)(16).

**9.** We note that the Commonwealth does not question either Rosas's or Brito's standing as they seek to suppress the evidence recovered under the pertinent exclusionary rules; it is

the suppression court erred in suppressing the cocaine uncovered in the back of the vehicle because the trooper was justified in detaining the defendants until Rosas could be positively identified. *See* Appellant's Brief, No. 1162 MDA 2004, at 1; Appellant's Brief, No. 1163 MDA 2004, at 1.

¶ 11 Our standard of review when the Commonwealth appeals from a suppression order is well-settled. As recently explained by the Honorable Patrick R. Tamilia of our Court, when an appellate court reviews the ruling of a suppression court, we consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. *See Commonwealth v. Gaul,* 867 A.2d 557, 559 (Pa.Super.2005). We must "first ascertain whether the record supports the factual findings of the suppression court, and then determine the reasonableness of the inferences and legal conclusions drawn therefrom." *Commonwealth v. Rosa,* 734 A.2d 412, 414 (Pa.Super.1999) (citation omitted), *appeal denied,* 561 Pa. 693, 751 A.2d 189 (2000). The suppression court's factual findings are binding on us and we may reverse only if the legal conclusions drawn therefrom are erroneous. *See Commonwealth v. Williams,* 749 A.2d 957, 960 (Pa.Super.2000), *appeal denied,* 564 Pa. 710, 764 A.2d 1069 (2001).

¶ 12 Initially, we note that all of the suppression court's findings of fact are traceable to testimony in the record; therefore, we focus our attention on the

propriety of the suppression court's legal conclusions. In this case, the parties do not dispute that the vehicle was properly stopped for a violation of the Motor Vehicle Code or that Trooper Henneman properly requested a driver's license, proof of insurance, and registration from Rosas. *See* 75 PA.CONS.STAT.ANN. § 6308(a) ("The operator of any vehicle or any pedestrian reasonably believed to have violated any provision of this title shall stop upon request or signal of any police officer and shall, upon request, exhibit a registration card, driver's license and information relating to financial responsibility, or other means of identification...."); *Rosa,* 734 A.2d at 414 ("Incident to this stop, an officer may check the vehicle's registration, the driver's license and obtain any information necessary to enforce provisions of the motor vehicle code."). The dispute centers on whether Trooper Housel was authorized to enter the vehicle following a lawful detention, which subsequently led to the discovery of the narcotics.

¶ 13 As stated, the suppression court concluded that Trooper Henneman lacked probable cause for an arrest, but nevertheless placed Rosas under arrest before he sought Rosas's consent to search the vehicle. Under this scenario, the suppression court concluded that the detention of the appellant was unlawful, necessitating the suppression of the narcotics found in the car "[b]ecause the search of the vehicle by consent occurred after [Rosas] was arrested without probable cause...." Trial

---

evident that both men clearly have standing. *See Commonwealth v. Hawkins,* 553 Pa. 76, 80, 718 A.2d 265, 267 (1998) ("This Court has accorded standing automatically, with no preliminary showing of a proprietary or possessory interest by the defendant, ... where possession at the time of the contested search and seizure is an essential element of the prosecution's case."). Similarly, the Com-

monwealth does not dispute either Rosas's or Brito's asserted privacy interests in the vehicle. *See Commonwealth v. Perea,* 791 A.2d 427, 429 (Pa.Super.2002), *appeal denied,* 568 Pa. 736, 798 A.2d 1288 (2002)("[I]n order to prevail, the defendant, as a preliminary matter, must show that he had a privacy interest in the area searched.").

Court Opinion, 6/28/04, at 5. The Commonwealth, on the other hand, contends that Rosas was not under arrest at the time he was asked to give his consent for the search, but rather, was the subject of an investigative detention.

■■■ ¶ 14 We agree with the Commonwealth and find that the troopers did not arrest Rosas and Brito until after the narcotics were discovered, and that prior to his formal arrest Rosas was the subject of an investigative detention. An investigative detention, which must be supported by reasonable suspicion, subjects a person to a stop and period of detention in order for the law enforcement officer to obtain more information.

> We have held consistently that the Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* [*v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968),] and its progeny recognize that the essence of good police work is for the police to adopt an intermediate response where they observe a suspect engaging in unusual and suspicious behavior. A brief stop of a suspicious individual, in order to determine his identity or to maintain the *status quo* momentarily while obtaining more information, may be reasonable in light of facts known to the officer at the time.

*Commonwealth v. Bryant*, 866 A.2d 1143, 1146 (Pa.Super.2005) (internal citations and quotation marks omitted) (brackets added). In *Commonwealth v. Zhahir*, 561 Pa. 545, 751 A.2d 1153 (2000), our Supreme Court set forth the determining factors to test the propriety of an investigative detention:

> [An appellate court's] inquiry is a dual one—whether the officer['s] action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place. Regarding the stop, a police officer may, short of an arrest, conduct an investigative detention if he has a reasonable suspicion, based upon specific and articulable facts, that criminality is afoot. The fundamental inquiry is an objective one, namely, whether the facts available to the officer at the moment of the [intrusion] warrant a man of reasonable caution in the belief that the action taken was appropriate. This assessment, like that applicable to the determination of probable cause, requires an evaluation of the totality of the circumstances, with a lesser showing needed to demonstrate reasonable suspicion in terms of both quantity or content and reliability.

*Id.*, 561 Pa. at 552, 751 A.2d at 1156–1157 (citation omitted) (brackets added). *See also, Commonwealth v. Reppert*, 814 A.2d 1196, 1204 (Pa.Super.2002).

■■■ ¶ 15 In the present case, Trooper Henneman was confronted with a situation where, after lawfully stopping a driver for a violation of the Motor Vehicle Code, the driver, as mentioned:

> (1) could not produce a valid driver's license;
>
> (2) could not supply a precise home address;
>
> (3) did not have an insurance card;
>
> (4) did not have a registration for the vehicle; and
>
> (5) did not have any type of photo or definitive identification.

¶ 16 Not only was Rosas unable to produce any of the statutorily required documentation, but the vehicle was registered to a woman in West Virginia. Furthermore, Trooper Henneman had obtained information from the NCIC that the driver

was a potential fugitive alien. Facing no other alternative other than releasing Rosas from temporary detention,[10] Trooper Henneman took the responsible and commendable action of investigating Rosas's true identity.

¶ 17 Given the foregoing circumstances, we find that there were sufficient facts presented at the suppression hearing to support a reasonable inference that criminal activity might have been afoot to justify Trooper Henneman's continued detention of Rosas after the initial stop. At the very least, Trooper Henneman was fully justified in detaining the vehicle and its occupants so as to conduct an investigation in an effort to confirm Rosas's identity and determine his connection to the vehicle. *See Commonwealth v. Moser*, 757 A.2d 377, 379 (Pa.Super.2000) (since neither the driver, nor his passenger, was able to show that they either owned or had permission to drive the vehicle, the police, who had stopped car for traffic violation, were justified in checking further to be sure that the car was not stolen); *Commonwealth v. Rogers*, 741 A.2d 813, 817–818 (Pa.Super.1999), *aff'd*, 578 Pa. 127, 849 A.2d 1185 (2004) (combination of incomplete title papers in a name different from driver's license, driver's evasiveness and nervousness, and presence of open detergent and fabric softener boxes which are commonly packaged with drugs to mask their odor, were sufficient to warrant further detention and investigation).

¶ 18 While we acknowledge that Trooper Henneman ordered Rosas out of the car and placed him in handcuffs, such facts, by themselves, do not support the conclusion that Rosas was under arrest. It is well-established that "when an officer detains a vehicle for violation of a traffic law, it is inherently reasonable that he or she be concerned with safety and, as a result, may order the occupants of the vehicle to alight from the car." *Commonwealth v. Rosa*, 734 A.2d 412, 414 (Pa.Super.1999) (citation omitted). Furthermore, for their safety, police officers may handcuff individuals during an investigative detention. *See, e.g., Commonwealth v. Guillespie*, 745 A.2d 654, 660–661 (Pa.Super.2000) (act of handcuffing suspects during investigatory detention "was merely part and parcel of ensuring the safe detaining of the individuals during the lawful *Terry* stop" and did not constitute an arrest). In addition, it must be remembered that "every traffic stop and every *Terry* stop involves a stop and period of time during which the suspect is not free to go but is subject to the control of the police officer detaining him." *Id.*, at 660. In fact, it is worth noting that Trooper Henneman's testimony supports our conclusion that Rosas was not under arrest as Trooper Henneman noted that it was his intention to detain Rosas "until," he "could actually find out if this was actually him." N.T., 6/16/04, at 10 (emphasis added).

¶ 19 Of course, merely because a police officer says that an individual is not under arrest is not conclusive on whether an arrest was actually effectuated. *See Commonwealth v. Conde*, 822 A.2d 45, 53 (Pa.Super.2003) (Bender, J., concurring). An arrest is defined as

> [a]ny act that indicates an intention to take the person into custody and subjects him to the actual control and will of the person making the arrest.... The test is an objective one, *i.e.*, viewed in

---

10. It is perplexing to try to guess how Trooper Henneman was supposed to issue a valid citation under Pa.R.Crim.P., Rule 403(A)(2), 42 PA.CONS.STAT.ANN., which requires the defendant's name and address, until Rosas's identity and home address were definitively determined.

the light of the reasonable impression conveyed to the person subjected to the seizure rather than the strictly subjective view of the officers or the persons being seized.

*Id.*, at 53–54 (citing *Commonwealth v. Butler,* 729 A.2d 1134, 1137 (Pa.Super.1999), *appeal denied,* 560 Pa. 668, 742 A.2d 167 (1999)). We are equally aware of our Supreme Court's refusal to hold that every time an individual is placed in handcuffs that such individual has been arrested. *See id.,* at 52, 742 A.2d 167 (citing *Commonwealth v. Guillespie,* 745 A.2d 654, 660 (Pa.Super.2000), in turn citing *Commonwealth v. Carter,* 537 Pa. 233, 247 n. 2, 643 A.2d 61, 67 n. 2 (1994)). In the matter presently before us, when we balance all the circumstances of the detention, and consider the information both available to and unknown by Trooper Henneman, which had been explained by Trooper Henneman to Rosas, we cannot conclude that Rosas had a reasonable belief that he was under a custodial *arrest* at the time Trooper Henneman was still obtaining information about Rosas's true identity.

▇▇▇▇▇▇ ¶ 20 Accordingly, based on the foregoing, we find that the suppression court erred in concluding that Rosas was under arrest. This does not end our inquiry, however, as we must next determine whether Rosas voluntarily consented to the search of his vehicle. It is axiomatic that a search warrant is not needed when a person with the requisite authority "unequivocally and specifically consents to a search." *Commonwealth v. Acosta,* 815 A.2d 1078, 1083 (Pa.Super.2003) (*en banc*), *appeal denied,* 576 Pa. 710, 839 A.2d 350 (2003). Whether an individual has voluntarily consented to a search "is one of fact which must be determined in each case from the totality of the circumstances." *Commonwealth v. Mancini,* 340 Pa.Super. 592, 490 A.2d 1377, 1383 (1985). The Com-

monwealth bears the burden of proving that a person consented to a warrantless search. *See Acosta,* 815 A.2d at 1083. Therefore, the Commonwealth must prove "that a consent is the product of an essentially free and unconstrained choice—not the result of duress or coercion, express or implied, or a will overborne—under the totality of the circumstances." *Id.* (citation omitted).

▇▇▇▇ ¶ 21 In making the determination of whether a consent is free and voluntary, the following factors may be taken into consideration:

● the person's knowledge of the right to refuse to consent to the search;

● the maturity, sophistication and mental or emotional state of the defendant (including age, intelligence and capacity to exercise free will); and

● the presence or absence of physical contact or police direction of the subject's movements, the demeanor of the police officer, the manner of expression used by the officer in addressing the subject, the location of the encounter, and the content of the interrogatories or statements.

*Commonwealth v. Strickler,* 563 Pa. 47, 79, 757 A.2d 884, 897–898, 901 (2000).

¶ 22 Turning to the circumstances surrounding the search and seizure in the instant case, we initially note the testimony of Trooper Henneman that he observed a license plate, in plain view, in the vehicle's "back hatch area" and asked Rosas, an adult male, if he could "retrieve the license plate." N.T., 6/16/04, at 12. Trooper Henneman stated that Rosas said he had "no problem" with the request. *Id.* Thus, the record indicates that Trooper Henneman made the request to search in a non-coercive way. Furthermore, as aforesaid, the record discloses that at no time did Trooper Henneman tell Rosas that he was under arrest; instead, Trooper Hen-

neman specifically told Rosas that he was being detained because he was "possibly a deported felon" with an immigration violation. *Id.*, at 11, 757 A.2d 884. There is, therefore, nothing in the record which indicates implied or express coercion.

¶ 23 We further find that although Rosas was handcuffed in the presence of the troopers, this fact is simply insufficient to create a presumption of lack of voluntariness in his consent to the search. Although not binding, we find support for our conclusion from federal cases. *See United States v. Bernitt*, 392 F.3d 873, 877 (7th Cir.2004), *cert. denied*, —— U.S. ——, 125 S.Ct. 1882, 161 L.Ed.2d 754 (2005) (finding consent voluntary where adult male suspect had been arrested, handcuffed, placed in police vehicle, and not advised of *Miranda* rights); [11] *United States v. Strache*, 202 F.3d 980, 986 (7th Cir.2000) (holding that where a defendant was handcuffed for twenty minutes and had not been read his *Miranda* rights, his consent to search was nonetheless voluntary). Under the totality of the circumstances presented in the present case, we find that Rosas's consent was voluntarily given as it was "the product of an essentially free and unconstrained choice." *Acosta*, 815 A.2d at 1083. Rosas points to no evidence which demonstrates otherwise.

¶ 24 In light of the foregoing discussion, the orders granting Brito's and Rosas's suppression motions are reversed.

¶ 25 Order at No. 1162 MDA 2004 reversed. Order at No. 1163 MDA 2004 reversed. Cases remanded for trial. Jurisdiction relinquished.

¶ 26 Judge BENDER notes his dissent.

11. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).