J.S07045-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| MIGUEL A. LIRIANO, | : | |
| | : | |
| Appellee | : | No. 959 MDA 2015 |

Appeal from the Order Entered May 18, 2015
in the Court of Common Pleas of Berks County Criminal Division
at No(s): CP-06-CR-0005975-2014

BEFORE: BOWES, OTT, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:           **FILED JANUARY 29, 2016**

The Commonwealth appeals from the order of the Berks County Court of Common Pleas granting Appellee Miguel A. Liriano's motion to suppress statements and evidence obtained by police officers following a traffic stop. The Commonwealth claims the officers' interactions with Appellee constituted a lawful investigative detention and the challenged evidence was discovered during a proper consensual search of the vehicle. We reverse.

The facts underlying this appeal are not in dispute.

> On December 7th, 2014, at approximately 1:00 am, Police Officer Danny Voorhies and Officer Joseph Ring of the Reading Police Department were on patrol in the area of the Italian Garden parking lot in the 800 block of Court Street. The officers observed a male[, Appellee,] exit

---

[*] Former Justice specially assigned to the Superior Court.

[from the driver's seat[1]] of a maroon Ford 500 parked in the lot. Officer Voorhies ran the license plate of the vehicle and discovered the tag had an insurance cancellation. The Officers parked their patrol vehicle and waited until the maroon Ford 500 exited the parking lot [at approximately 2:00 am] and followed the vehicle . . . .

Officer Voorhies conducted a traffic stop and identified the driver as [Appellee]. During the traffic stop, Officer Voorhies received documentation on the vehicle and discovered that [Appellee] did not own the vehicle. Officer Ring[, who was standing outside passenger's side door[2]] noticed an open beer bottle in the driver's side door in plain view. Officer Voorhies also noticed a black rubber band near the center console of the vehicle.[3] Officer Voorhies suspected that the rubber band is used to package heroin. Officer Voorhies asked [Appellee] to exit the vehicle. Officer Voorhies conducted a pat down and asked [Appellee] questions about the beer and black rubber band in the vehicle. After the conversation, [Appellee] gave consent to search the vehicle and drug contraband[4] was found in the center console. [Appellee] was placed under arrest and the Officers took him to the Central Processing Center and then to the DUI center for drug testing. [Appellee] refused to submit to a blood test.

---

[1] There was reference to a passenger exiting the vehicle in the parking lot. N.T. Suppression H'rg, 4/10/15, at 20. There were no indications that a passenger was in the vehicle at the time of the stop.

[2] *Id.* at 31.

[3] Officer Voorhies testified he used his flashlight to illuminate the inside of the vehicle. *Id.* at 23.

[4] "Valtox" tests of the suspected narcotics were positive for methamphetamine and heroin. *Id.* at 19. However, laboratory tests were pending at the time of the hearing. *Id.*

Trial Ct. Op., 8/11/15, at 2; **see also** Findings of Fact and Conclusions of Law Pursuant to Pa.R.Crim.P. 581(I), 5/18/15, at 1. Officer Voorhies described the evidence recovered from the vehicle:

> In the center console . . . there was a clear sandwich baggie.
>
> \* \* \*
>
> In the sandwich baggie, there were fourteen (14) bags of methamphetamine, it was broken down into different denominations. There were four (4) bigger, clear Ziploc baggies, there were five (5) smaller, clear Ziploc baggies and then there were five (5) red tinted Ziploc baggies, however, it was still clear enough that you could see into the bags. There were—also inside of that bag was a separate clear sandwich bag inside of that was bundles of suspected heroin. Those bundles, there were three (3) bundles which there were three (3) to a bundle and there was one (1) loose cellophane bag. The bundles themselves were secured with small black rubber bands, the same kind of rubber band that was in plain view . . . .

N.T. Suppression H'rg, 4/10/15, at 15-16. The officer also recovered $33 and a cellphone during a search of Appellee after he was taken into custody. **Id.** at 17.

Appellee was charged with two counts each of possession and possession with intent to deliver controlled substances[5] and four counts of driving under the influence.[6] Appellee filed an omnibus pretrial motion,

---

[5] 35 P.S. § 780-113(a)(16), (30).

[6] 75 Pa.C.S. § 3802(a)(1), (d)(1)(i)-(iii).

including a motion to suppress all evidence obtained from the traffic stop. The trial court held a hearing on April 10, 2014.

On May 18, 2015, the trial court granted Appellee's suppression motion. The court determined that "the questions asked by the officer constitute[d a] custodial interrogation." Trial Ct. Op. at 5. "[S]ince no **Miranda**[7] warnings had been given at that time . . . the questioning on the part of the officer was a violation of Appellee's Fifth Amendment rights." **Id.** The court thus concluded, "Appellee's statements are inadmissible as evidence and the seizure of the contraband found in the center console did occur in violation of [Appellee's] constitutional rights . . . ." **Id.** This timely appeal followed.[8]

The Commonwealth presents the following question for review:

> Did the trial court err in suppressing evidence obtained as a result of a lawful consensual search of the vehicle [Appellant] was driving?

Commonwealth's Brief at 4. The Commonwealth asserts Appellee "was subject to an investigative detention[,]" namely, a traffic stop "to determine whether the insurance on the vehicle was cancelled." **Id.** at 14. The Commonwealth further contends "[n]othing in the record suggests that the

---

[7] **Miranda v. Arizona**, 384 U.S. 436 (1966).

[8] The Commonwealth included a Pa.R.A.P. 311(d) certification in its June 2, 2015 notice of appeal and submitted a Pa.R.A.P. 1925(b) statement on June 15th. The trial court filed a responsive opinion.

consent to search given by [Appellee] was a product of duress or coercion."

*Id.* at 15. We agree and find relief is due.

The principles governing our review are as follows:

> Our standard of review when the Commonwealth appeals from a suppression order is well-settled. [W]hen an appellate court reviews the ruling of a suppression court, we consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. We must "first ascertain whether the record supports the factual findings of the suppression court, and then determine the reasonableness of the inferences and legal conclusions drawn therefrom."

*Commonwealth v. Rosas*, 875 A.2d 341, 346 (Pa. Super. 2005) (citations omitted). "[W]here the appeal of the determination of the suppression court turns on allegations of legal error, 'the suppression court's conclusions of law are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts.'" *Commonwealth v. Kemp*, 961 A.2d 1247, 1253 (Pa. Super. 2008) (*en banc*) (citations omitted).

It is well settled that

> [v]alid citizen/police interactions which constitute seizures generally fall within two categories, distinguished according to the degree of restraint upon a citizen's liberty: the investigative detention or *Terry*[9] stop, which subjects an individual to a stop and a period of detention but is not so coercive as to constitute the functional equivalent of an arrest; and a custodial detention or arrest, the more restrictive form of permissible encounters.

---

[9] *Terry v. Ohio*, 392 U.S. 1 (1968).

- 5 -

> To maintain constitutional validity, an investigative detention must be supported by a reasonable and articulable suspicion that the person seized is engaged in criminal activity and may continue only so long as is necessary to confirm or dispel such suspicion; whereas, a custodial detention is legal only if based on probable cause.

*Commonwealth v. Strickler*, 757 A.2d 884, 889 (Pa. 2000) (citations omitted).

> A law enforcement officer must administer *Miranda* warnings prior to custodial interrogation. The standard for determining whether an encounter with the police is deemed "custodial" or police have initiated a custodial interrogation is an objective one based on a totality of the circumstances, with due consideration given to the reasonable impression conveyed to the person interrogated. Custodial interrogation has been defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his [or her] freedom of action in any significant way." "Interrogation" is police conduct calculated to, expected to, or likely to evoke admission. When a person's inculpatory statement is not made in response to custodial interrogation, the statement is classified as gratuitous, and is not subject to suppression for lack of warnings.

>       \*    \*    \*

> The test for determining whether a suspect is being subjected to custodial interrogation so as to necessitate *Miranda* warnings is whether he is physically deprived of his freedom in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation. Said another way, police detentions become custodial when, under the totality of the circumstances, the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of arrest.

> The factors a court utilizes to determine, under the totality of the circumstances, whether a detention has become so coercive as to constitute the functional equivalent of arrest include: the basis for the detention; its length; its location; whether the suspect was transported against his or her will, how far, and why; whether restraints were used; whether the law enforcement officer showed, threatened or used force; and the investigative methods employed to confirm or dispel suspicions. The fact that a police investigation has focused on a particular individual does not automatically trigger "custody," thus requiring **Miranda** warnings.

**Commonwealth v. Schwing**, 964 A.2d 8, 11-12 (Pa. Super. 2008) (citation omitted).

Generally, a routine traffic stop constitutes an investigative detention. **Cf. Commonwealth v. Chase**, 960 A.2d 108, 113 (Pa. 2008). "Thus, in the typical situation in which a motorist is temporarily ordered to remain by the side of his car, **Miranda** warnings are not essential." **Commonwealth v. Sullivan**, 581 A.2d 956, 958 (Pa. Super. 1990) (citation omitted). **Miranda** may apply "when the suspect is placed under arrest or when the questioning of the suspect is so prolonged or coercive as to approximate the atmosphere of a station house interrogation." **Id.**; **see also Commonwealth v. Turner**, 772 A.2d 970, 974-976 (Pa. Super. 2001) (*en banc*) (holding detention was custodial when, *inter alia*, officer detained defendant in patrol car until second officer arrived, and second officer questioned defendant while blocking doorway and leaning into backseat).

Instantly, the initial traffic stop was proper. *See* 75 Pa.C.S. § 6308(b) ("Whenever a police officer . . . has reasonable suspicion that a violation of this title is occurring or has occurred, he may stop a vehicle, upon request or signal, for the purpose of checking the vehicle's registration, proof of financial responsibility, vehicle identification number or engine number or the driver's license."); *see also* 75 Pa.C.S. § 1786(a) ("Every motor vehicle of the type required to be registered under this title which is operated or currently registered shall be covered by financial responsibility"); *Commonwealth v. Bolton*, 831 A.2d 734, 736-37 (Pa. Super. 2003). Further, under the totality of the circumstances, Officer Voorhies possessed specific facts to conduct a further investigation given the presence of an open beer bottle, as well as the rubber band, in plain view. That the officer ordered Appellee out of the car, directed him to the rear of the vehicle, and conducted a pat-down search in anticipation of field sobriety tests did not transform a proper investigative detention into a custodial detention. *See Rosas*, 875 A.2d at 348, 350 (noting facts that state trooper ordered defendant out of vehicle and handcuffed him did not support conclusion that defendant was under arrest); *Sullivan*, 581 A.2d at 957-58 (holding defendant not in custody after he was directed to perform simple sobriety tests).

Moreover, Officer Voorhies, during direct examination by the Commonwealth, described the interaction as follows:

[Commonwealth]: So, officer, after you had noticed the open bottle and the rubber bands, what did you do next?

A I asked [Appellee] to step out of the vehicle, I was going to administer field sobriety tests.

Q And what occurred after he stepped out of the vehicle?

A He stepped out of the car, I performed a pat down for weapons, no weapons were found on the person, and then he walked to the rear of the vehicle.

Q And now, at this point can you kind of describe the scene for the court?  How many officers were involved?

A Just myself and Officer Ring.

Q And I'm assuming it was dark out?

A Yes, it was two in the morning.

Q Could you describe—well, we'll get to that in a minute, I'm sorry.  After he had gone to the back of the vehicle, What occurred then?

A At that point I was informing him of why I had him step out of the car.  I informed him he had an open container of beer in the car and I observed the small rubber band in the center console area.  I asked him, I said, There's nothing else in your car?  He said, No, and he said, You can check.  I didn't ask him, he just said, You can check.

   At that point I then asked him again, I said, So you don't mind if I look in your car, and I believe his exact words were—as close to—There shouldn't be anything in there, but you can go ahead and look.

Q Could you describe your tone of voice at this time?

A We were having a normal conversation like we're having right now.

Q At this point you had testified previously that you had asked him for his driver's license were you still in possession of that document?

A Yes, I was.

Q After he had told you that you could check the vehicle, what did you do?

A At that point I took him up on the offer and I went in and checked the inside of the vehicle.

N.T. at 13-14.

On cross-examination by Appellee's counsel, Officer Voorhies acknowledged that Appellee was "in custody" and not "free to walk away[.]" *Id.* at 32. However, as to the circumstances of the interaction, the following exchange occurred:

[Appellee's counsel]: So, at that point then you talk about the, whether you can look in the car and search the car?

A At that point I was explaining to him why he was removed from the car.

Q All right. You would agree with me, would you not, that he was in your custody and couldn't just walk off?

A That's correct.

Q And at that point you didn't explain to him his *Miranda* warnings, is that correct?

A Correct.

Q But you continued to have dialogue with him about these items you saw in the car, right?

A There was only one sentence that was interchanged between the two of us.

Q So, I'll take that as a "yes".

And then the discussion about consenting search in the car took place, right?

A No question was asked, he offered consent, correct.

Q The vehicle that he didn't own to your knowledge, right?

A Correct.

Q Now, where was Officer Ring standing when that discussion took place?

A I believe he was off to my right side.

Q Were you both standing there in the same general area where [Appellee] was?

A No, I was standing talking to him as contact, he would have been cover, standing off to the right-hand side.

Q How far from where you were standing?

A Far enough that when I was speaking to him, I didn't notice him in my peripheral vision, but as far as feet, I can't testify to how far that was.

Q You conducted a search of the vehicle?

A Right.

Q Where was [Appellee] when you were searching the vehicle?

A He was at the back of the car with Officer Ring.

Q At any point in time when he was standing outside the vehicle was he placed into handcuffs?

A No.

N.T. at 32-34.

In light of the uncontradicted evidence regarding the interaction, we conclude the detention was not custodial. *See Schwing*, 964 A.2d at 11-12; *Rosas*, 875 A.2d at 349-50; *Sullivan*, 581 A.2d at 958. Moreover, the exchange leading to Appellee's consent to a search was not an interrogation. Thus, *Miranda* was not implicated. *See Schwing*, 964 A.2d at 11-12; *Rosas*, 875 A.2d at 349-50; *Sullivan*, 581 A.2d at 958. Lastly, we discern no basis in the record to conclude that Appellee's consent was coerced by the officers or involuntarily offered. Accordingly, we must reverse the trial court's order granting suppression and remand this matter for further proceedings.

Order reversed. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/29/2016