J-A14033-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
DEAN ANTHONY SMITH :
:
Appellant : No. 1475 WDA 2019

Appeal from the Judgment of Sentence Entered September 9, 2019
in the Court of Common Pleas of Indiana County
Criminal Division at No(s): CP-32-CR-0001083-2018

BEFORE: SHOGAN, J., McLAUGHLIN, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.: FILED DECEMBER 16, 2020

Dean Anthony Smith ("Smith") appeals from the judgment of sentence imposed following his conviction of two counts of driving under the influence of alcohol ("DUI").[1, 2] We affirm.

On July 13, 2018, Pennsylvania State Police Trooper Kenneth Sink ("Trooper Sink"), was on routine patrol in full uniform and operating a marked police cruiser. At approximately 9:46 p.m., Brian Force ("Force") called the Pennsylvania State Police and reported an erratic driver approaching the intersection of Warren Road and Indian Springs Road in White Township,

_____

[1] 75 Pa.C.S.A. § 3802(a)(1), (c).

[2] Smith purports to appeal from the May 22, 2019, Order denying his Omnibus Pre-Trial Motion. However, an appeal in a criminal case properly lies from the judgment of sentence. Commonwealth v. Lawrence, 99 A.3d 116, 117 n.1 (Pa. Super. 2014). We have corrected the caption accordingly.

Indiana County. Force indicated that a brown Ford Explorer, registration KGT-0318, had driven erratically through the Indiana Regional Mall parking lot and proceeded west on Warren Road.

Trooper Sink, informed by dispatch of the phone call and the brown Ford Explorer, proceeded towards Warren Road. Upon arriving at the intersection of Warren Road and Indian Springs Road, Trooper Sink observed a brown Ford Explorer matching the description from the dispatch. Trooper Sink pulled behind and followed the Ford Explorer.

The Ford Explorer continued onto Ben Franklin Road.[3] After following the Ford Explorer for an unknown amount of time and an unspecified distance, Trooper Sink observed the vehicle cross the double-yellow center line, with its front and rear driver-side tires. Based upon this observation, Trooper Sink initiated a traffic stop. Trooper Sink exited his vehicle and approached the Ford Explorer. Trooper Sink asked the driver, later identified as Smith, for identification. Smith appeared confused at first, then handed his entire wallet to Trooper Sink. Smith told Trooper Sink to find the driver's license himself. Trooper Sink was able to locate Smith's driver's license in his wallet.

During the stop, Trooper Sink observed a strong odor of alcohol emanating from Smith, and noticed that Smith's eyes were bloodshot and

_____

[3] We note that Indian Springs Road becomes Ben Franklin Road after crossing Warren Road.

glassy. Trooper Sink directed Smith to exit the vehicle and perform field sobriety tests ("FSTs"). After observing Smith perform the FSTs, Trooper Sink concluded, based upon his prior observations and the FSTs, that Smith was impaired, and placed Smith under arrest for suspected DUI.

While Trooper Sink transported Smith to the Indiana Regional Medical Center ("IRMC"), Smith told Trooper Sink about his military history and said that his hands were deadly weapons. Upon arrival at the IRMC, Trooper Sink read Smith the Pennsylvania State Police DL-26b implied consent form ("DL-26b Form"). Additionally, Trooper Sink advised Smith of his right to refuse chemical testing. Smith verbally consented to the blood test.[4] Smith's blood was drawn at IRMC. Subsequent chemical testing revealed that Smith's blood alcohol content ("BAC") was 0.245%.

On December 10, 2018, Smith was charged with two counts of DUI and one count each of driving within single lane and careless driving.[5] Smith filed an Omnibus Pre-Trial Motion. Smith argued that Trooper Sink lacked the requisite probable cause to effectuate a traffic stop, where he had only observed Smith crossing the center line one time. Additionally, Smith asserted that his consent to the blood draw was coerced by Trooper Sink.

_____

[4] Smith did not sign the DL-26b Form, because he remained in handcuffs as a result of his statement that his hands were deadly weapons.

[5] 75 Pa.C.S.A. §§ 3309(1), 3714(a).

On February 13, 2019, the suppression court conducted a hearing on Smith's Motion. At the end of testimony, Smith made an oral Motion to supplement his Omnibus Pre-Trial Motion with a brief, because the Commonwealth had failed to preserve the Mobile Video Recorder ("MVR") dash camera recording for trial.[6] The trial court granted Smith leave to file a supplemental brief to his Motion.

Smith filed his supplemental brief on May 13, 2019, in which he incorporated the arguments of his Omnibus Pre-Trial Motion. Additionally, Smith claimed that his consent to the blood draw was coerced when Trooper Sink kept Smith in handcuffs, told him that restoration of his license may cost up to $2,000.00, and stated that Smith would be going to jail that night if he did not consent to the blood draw. Further, Smith argued that the

_____

[6] According to Trooper Sink, his police cruiser is equipped with an MVR system. N.T. (Pre-Trial Motions Hearing), 2/13/19, at 31. Trooper Sink testified that an MVR system begins recording as soon as the cruiser's lights and sirens are activated, and the recording will capture the 30 to 60 seconds prior to the activation of the lights and sirens. Id. Trooper Sink stated that the MVR recordings are ultimately deleted, but that he was unsure of how long the recordings were saved before they are deleted. Id. at 33-34. Trooper Sink testified that, in order to preserve an MVR dash camera recording, the Pennsylvania State Police policies require a Trooper to fill out an MVR request and submit it to a supervisor. Id. at 33-34. The supervisor has access to the MVR library and would retrieve the requested MVR video. Id. at 33. Trooper Sink stated that he never requested the MVR dash camera recording in this case, and that he had "no reason" for not requesting the MVR recording. Id. at 31-32, 38.

Commonwealth committed a Brady[7] violation when Trooper Sink failed to request the MVR dash camera video, and that he did so in bad faith. The Commonwealth filed a brief in response. On May 22, 2019, the trial court denied Smith's Omnibus Pre-Trial Motion and issued an Order and Opinion explaining its factual findings and reasons for denying Smith's Motion.

Following a stipulated non-jury trial on September 9, 2019, Smith was convicted of two counts of DUI, and acquitted of driving within single lane and careless driving. On the same day, the trial court sentenced Smith to an aggregate sentence of one to five years in prison, with credit for time served, plus fines and costs.

Smith filed a timely Notice of Appeal and court-ordered Pa.R.A.P. 1925(b) Concise Statement of errors complained of on appeal.

Smith now presents the following issues for our review:

1. Whether probable cause/reasonable suspicion existed to justify a traffic stop of [Smith]'s vehicle for a suspected violation of 75 Pa.C.S.[A.] § 3309(1)?

2. Whether [Smith]'s consent to [the] draw blood was coerced by the circumstances surrounding the request for a blood sample, as well as[] the threat of a possible $2,000.00 restoration fee to restore [Smith]'s driver's license if he were to refuse a warrantless blood test?

3. Whether the [s]uppression [c]ourt erred as a matter of law in finding that the MVR recording capturing the relevant portions of

---

[7] Brady v. Maryland, 373 U.S. 83, 87 (1963) (holding that the prosecution must disclose evidence favorable to the accused that is material either to guilt or punishment).

the traffic stop and arrest did not constitute materially exculpatory evidence?

4. Whether the [s]uppression [c]ourt erred as a matter of law in finding that the willful decision by the arresting officer to not preserve the MVR recording[,] which captured the relevant portions of the traffic stop and the arrest[,] did not constitute bad faith on the part of the arresting officer?

Brief for Appellant at 5.

All of Smith's claims challenge the trial court's denial of his Omnibus Pre-Trial Motion. We adhere to the following standard of review:

We may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. An appellate court, of course, is not bound by the suppression court's conclusions of law.

Commonwealth v. Hampton, 204 A.3d 452, 456 (Pa. Super. 2019). Such an inquiry must take into account the totality of the circumstances. Commonwealth v. Delvalle, 74 A.3d 1081, 1085 (Pa. Super. 2013).

In his first claim, Smith argues that Trooper Sink lacked the requisite probable cause to conduct a traffic stop. Brief for Appellant at 15. Smith asserts that his vehicle only crossed the center line a single time. Id. Smith acknowledges that his vehicle crossed the line by the width of his tire. Id. However, Smith contends that this infraction was a "momentary and minor

deviation from the lane of travel," and did not rise to the level of probable cause necessary for Trooper Sink to initiate a vehicle stop. Id.[8]

Probable cause is required to effectuate a traffic stop based on a suspected violation of the Motor Vehicle Code, including driving within single lane.[9] Commonwealth v. Feczko, 10 A.3d 1285, 1288 (Pa. Super. 2010). To satisfy this standard, an officer must be able to "articulate specific facts possessed [] at the time of the questioned stop, which would provide probable cause to believe that the vehicle or the driver was in violation of some provision of the [Motor Vehicle] Code." Id. at 1291 (citation, quotation marks and emphasis omitted).

"Whether an officer possesses probable cause to stop a vehicle for a violation of [] section [3309(1) of the Motor Vehicle Code] largely depends upon [] whether a driver's movement from his lane is done safely." Commonwealth v. Cook, 865 A.2d 869, 874 (Pa. Super. 2004). In analyzing whether a driver has created a safety hazard by failing to drive within a single

_____

[8] In its Opinion, the suppression court addressed Smith's claim as whether there was reasonable suspicion to conduct a traffic stop based on suspicion of DUI. Opinion and Order, 5/22/19, at 5-9. However, the record reflects that Trooper Sink initiated the stop based on the observed violation of section 3309(1). See N.T. (Pre-Trial Motions Hearing), 2/13/19, at 9, 27.

[9] Section 3309(1) of the Motor Vehicle Code provides that "[a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from the lane until the driver has first ascertained that the movement can be made with safety." 75 Pa.C.S.A. § 3309(1).

lane, this Court has considered factors such as whether there is oncoming traffic in the opposite lane, whether the driver overcorrects by rapidly jerking the vehicle back into the appropriate lane, the degree to which the vehicle crosses the center or fog line, the number of times the vehicle crosses either line, and the distance over which the driver is observed to have made these mistakes. See Feczko, 10 A.3d at 1292 (finding that police had probable cause to conduct a traffic stop for a violation of driving within single lane where the driver of a vehicle was "weaving within his lane and crossed out of his lane of travel on numerous occasions[]" and, that the driver had created a safety hazard where, despite other vehicles not needing to take evasive action, there were vehicles in the lane adjacent to the defendant); Cook, 865 A.2d at 874-75 (holding that the police officer had probable cause to stop the defendant, where the officer received information that the defendant's car was being driven erratically; he followed the defendant for one mile; and he observed the defendant cross the fog line by half of a car width three times and rapidly jerk back into the traffic lane).

Additionally, we are cognizant that, "[w]hen the underlying source of the officer's information is an anonymous call, the tip should be treated with particular suspicion." Commonwealth v. Washington, 63 A.3d 797, 803 (Pa. Super. 2013) (citation omitted). "However, a tip from an informer known to the police may carry enough reliability for the police to conduct an investigatory stop." Id. (citation omitted).

- 8 -

Trooper Sink testified that he had received a dispatch informing him of Force's[10] telephone call, which reported a brown Ford Explorer driving erratically in the Indiana Regional Mall parking lot. N.T. (Pre-Trial Motions Hearing), 2/13/19, at 7, 18, 20. Trooper Sink testified that he drove towards Warren Road. Id. at 7-8. Upon arriving at the intersection of Warren Road and Indian Springs, Trooper Sink observed a brown Ford Explorer stopped at the red light on Warren Road. Id. at 22-23. Trooper Sink stated that he pulled up behind the Ford Explorer and confirmed the license plate with dispatch. Id. at 20, 23.

Trooper Sink testified that he followed the Ford Explorer as it made a right turn onto Ben Franklin Road. Id. at 8, 23. After an unknown distance and unknown duration of time, Trooper Sink stated that he observed the Ford Explorer cross over the double-yellow center line with both driver's side tires, by at least the width of the tire, one time. Id. at 8, 23-24, 26. According to Trooper Sink, there were no vehicles between himself and the brown Ford Explorer. Id. at 24. Trooper Sink testified that, after observing the Ford Explorer cross the center line a single time, he activated his emergency lights

_____

[10] Trooper Sink's Pennsylvania State Police Incident Report indicates that the Pennsylvania State Police dispatch received a call from Force. See Commonwealth Exhibit B at 3 (unnumbered). The Report indicates that Force stated he was following a brown Ford Explorer with Pennsylvania registration KGT-0318, and that the Ford Explorer was driving erratically through the Indiana Regional Mall parking lot. Id.

and sirens. Id. at 9; see also id. at 26-27 (wherein Trooper Sink stated that he effectuated the traffic stop for a violation of section 3309(1) of the Motor Vehicle Code). According to Trooper Sink, the Ford Explorer pulled over immediately. Id. at 9.

Upon review, we conclude that the totality of the circumstances supports the determination that Trooper Sink had probable cause to effectuate a traffic stop. See Commonwealth v. Hayward, 756 A.2d 23, 36 (Pa. Super. 2000) (stating that "[i]dentified citizens who report their observations of criminal activity to police are assumed to be trustworthy."); see also Commonwealth v. Spencer, 888 A.2d 827, 831 (Pa. Super. 2005) (stating that an identified caller's information supported a finding of probable cause where the identified caller provided the make, model, color, direction of travel, and license plate number to the police). Additionally, Trooper Sink observed Smith's Ford Explorer cross the double-yellow center line with both driver-side tires, by an entire tire width. Because the record support's the trial court's determination, we cannot grant Smith relief on this claim.

In his second claim, Smith asserts that Trooper Sink coerced Smith's consent to a blood draw, by threatening him with a possible $2,000.00 fee to restore his driver's license. Brief for Appellant at 16. Smith contends that he was in handcuffs when Trooper Sink asked Smith for consent to the blood draw. Id. at 17. Smith acknowledges that upon being read the DL-26b Form and informed of the $2,000.00 restoration fee, he consented to the blood

draw. Id. Smith argues that the possibility of a $2,000.00 restoration fee is coercive for an average citizen. Id. at 18. Smith further asserts that Trooper Sink told Smith that he would go to jail if he did not consent to the blood draw. Id. at 18-19.

When determining whether consent to a blood draw was given voluntarily, we adhere to the following standard of review:

> In determining the validity of a given consent, the Commonwealth bears the burden of establishing that a consent is the product of an essentially free and unconstrained choice—not the result of duress or coercion, express or implied, or a will overborne—under the totality of the circumstances. The standard for measuring the scope of a person's consent is based on an objective evaluation of what a reasonable person would have understood by the exchange between the officer and the person who gave the consent. Such evaluation includes an objective examination of the maturity, sophistication and mental or emotional state of the defendant. Gauging the scope of a defendant's consent is an inherent and necessary part of the process of determining, on the totality of the circumstances presented, whether the consent is objectively valid, or instead the product of coercion, deceit, or misrepresentation.

Commonwealth v. Venable, 200 A.3d 490, 497 (Pa. Super. 2018) (citations omitted).

> While there is no hard and fast list of factors evincing voluntariness, some considerations include: 1) the defendant's custodial status; 2) the use of duress or coercive tactics by law enforcement personnel; 3) the defendant's knowledge of his right to refuse to consent; 4) the defendant's education and intelligence; 5) the defendant's belief that no incriminating evidence would be found; and 6) the extent and level of the defendant's cooperation with the law enforcement personnel.

Commonwealth v. Robertson, 186 A.3d 440, 447 (Pa. Super. 2018) (citations omitted).

In the instant case, Smith was arrested and transported to IRMC. N.T. (Pre-Trial Motions Hearing), 2/13/19, at 12. Once at IRMC, Trooper Sink read Smith the required DL-26b Form and, pursuant to the DL-26b Form, informed Smith that he would be subject to a restoration fee of "up to $2,000.00." Id. at 12-15. Additionally, Trooper Sink testified that he did not remove Smith's handcuffs, because Smith had threatened that his "hands were deadly weapons." Id. at 14-15. Trooper Sink testified that he did not threaten Smith with jail time or in any other way. Id. at 15-16.

In denying Smith's Omnibus Pre-Trial Motion, the trial court stated the following:

> [Smith] testifies that Trooper Sink told him that [Smith] was going to [go to] jail if he didn't consent. The [c]ourt finds this testimony false and not worthy of belief. This finding is based upon the following: 1) such a statement is inconsistent with Trooper Sink's conduct during the entirety of the incident; 2) the [c]ourt's observations of Trooper Sink during the course of his testimony; 3) the [c]ourt's observations of [Smith] during his testimony; and 4) [Smith]'s [BAC] at the time of the alleged statement.
>
> The facts worthy of belief surrounding [Smith's] consent are straightforward. Trooper Sink took [Smith] in handcuffs to IRMC for the blood draw. While at the hospital, Trooper Sink read the DL-26[b F]orm verbatim to [Smith]. [Smith] was still in handcuffs at the time the [DL-26b F]orm was read because [Smith] made a comment about his hands being deadly weapons. Trooper Sink asked [Smith] if he consented to the blood draw[;] [Smith] consented[;] and the blood draw was completed.
>
> [Smith] contends that paragraph 3 of the DL-26[b Form], specifically the portion that provides that a person who refuses the blood test "will have to pay a restoration fee or up to $2,000.00 in order to have (his/her) operating privilege restored" is inherently coercive. Th[e c]ourt disagrees. First, "up to

- 12 -

$2,000.00" could mean a restoration fee of $20.00 or $50.00 or $100.00; certainly, these amounts are not inherently coercive. [S]econd, a restoration fee is a civil penalty. The [c]ourt declines to find that every consent obtained following a reading of the DL-26[b F]orm is per se involuntary.

Trial Court Order and Opinion, 5/22/19, at 10-12.

Upon review, and considering the totality of the circumstances, we agree with and adopt the reasoning of the trial court in regards to Smith's second claim. See id.; see also Commonwealth v. Rosas, 875 A.2d 341, 350 (Pa. Super. 2005) (stating that even though the defendant had been handcuffed, his consent to a vehicle search was still valid). Accordingly, we cannot grant Smith relief on this claim.

We address Smith's remaining two claims together, because both claims challenge the Commonwealth's failure to provide the MVR dash camera recording as a violation of Brady. Brief for Appellant at 19, 21.

In his third claim, Smith asserts that the trial court erred in determining that the MVR recording did not constitute materially exculpatory evidence. Brief for Appellant at 19. Smith claims that the MVR recording could have been materially exculpatory because of conflicts between the testimony of Trooper Sink, and that of Smith. Id. at 20.

In his fourth claim, Smith asserts that Trooper Sink acted in bad faith when Trooper Sink failed to preserve the MVR recording. Id. at 21. In support, Smith asserts that Trooper Sink acknowledged that the MVR dash

camera recording captured the events, but had failed to request the video per the Pennsylvania State Police policies.  Id. at 21-22.

Smith fails to adequately develop his third and fourth claims for our review.  Smith's arguments regarding both of these claims contain boilerplate citations of this Court's standard of review, with no further discussion of relevant legal authorities, including Brady.  Accordingly, Smith's remaining claims are waived.  See Pa.R.A.P. 2119(a) (providing that an appellant's argument shall include "such discussion and citation of authorities as are deemed pertinent."); see also Commonwealth v. Hardy, 918 A.2d 766, 771 (Pa. Super. 2007) (stating that "it is appellant's duty to present arguments that are developed for our review" and "[t]his [C]ourt will not act as counsel and will not develop arguments on behalf of an appellant."); In re R.D., 44 A.3d 657, 674 (Pa. Super. 2012) (stating that where an appellant's brief lacks analysis, meaningful appellate review is precluded).

Moreover, to the extent that Smith claims that the MVR recording constituted materially exculpatory evidence and that Trooper Sink acted in bad faith in failing to preserve the MVR video, such claims lack merit.  Our Supreme Court has stated the following:

> When the state fails to preserve evidence that is "potentially useful," there is no federal due process violation "unless a criminal defendant can show bad faith on the part of the police." Potentially useful evidence is that of which "no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.  In evaluating a claim that the Commonwealth's failure to preserve evidence violated a criminal defendant's federal due process rights, a court

must first determine whether the missing evidence is materially exculpatory or potentially useful.

Commonwealth v. Chamberlain, 30 A.3d 381, 402 (Pa. 2011) (citations omitted).

At the suppression hearing, Trooper Sink testified that the MVR recording would have shown the brown Ford Explorer crossing the double-yellow center line. See N.T. (Pre-Trial Motions Hearing), 2/13/19, at 32. Additionally, Trooper Sink testified as to the Pennsylvania State Police policies and procedures utilized when preserving MVR videos. Id. at 31-34, 38. Specifically, Trooper Sink stated that the MVR recordings are saved in an MVR library, and can only be accessed by a supervisor upon request by the respective Trooper. Id. at 33-34. Trooper Sink stated that he was uncertain for how long MVR recordings are stored in the MVR library, but that MVR recordings are automatically deleted after a certain amount of time, unless the Trooper had requested the MVR recording. Id. at 33-34. Trooper Sink testified that he did not request the MVR dash camera recording in this case, and that he had "no reason" for not requesting the MVR recording. Id. at 31-32, 38.

Our review of the record reveals that the MVR recording does not constitute materially exculpatory evidence, but instead would have been potentially useful evidence. See Commonwealth v. Spotti, 94 A.3d 367, 383 (Pa. Super. 2014) (en banc) (stating that "[t]he 'mere possibility' that the [video] recording 'might have' depicted events differently does not establish

'materiality.'"); see also Commonwealth v. Williams, 154 A.3d 336, 340-41 (Pa. Super. 2017) (stating that where video evidence "may" or "could" show events differently, that video evidence is potentially useful, not materially exculpatory). Additionally, our review of the record indicates that Trooper Sink did not act in bad faith, where the MVR recording was destroyed pursuant to the standard Pennsylvania State Police policies and procedures pertaining to MVR recording preservation. See Commonwealth v. Snyder, 963 A.2d 396, 406 (Pa. 2009) (stating that it is unlikely bad faith could be proven where evidence was destroyed pursuant to standard procedures). Accordingly, even if Smith had not waived his final claims, we would afford him no relief.[11]

Based upon the foregoing, we affirm Smith's judgment of sentence.

Judgment of sentence affirmed.

---

[11] While we do not grant Smith relief on his claims concerning the MVR dash camera recording, we emphasize the importance of dash camera videos in suppression proceedings. This Court has reviewed several cases where dash camera recordings were instrumental in determining the events leading up to a traffic stop. See Commonwealth v. Cephus, 208 A.3d 1096, 1099-1100 (Pa. Super. 2019) (stating that the dash camera footage "clearly show[ed] the [a]ppellant's vehicle drive over the center line three times in a twenty-five second period."); see also Commonwealth v. Houck, 102 A.3d 443, 457 (Pa. Super. 2014) (stating "[t]he critical piece of evidence admitted in this matter is [the dash camera footage,] which depicts the observations made by the police officer prior to the initial stop.") (emphasis added).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/16/2020