J-S43036-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| OLUBAYA MUDADA MENSAH RANGER | |
| Appellant | No. 147 WDA 2017 |

Appeal from the Judgment of Sentence January 6, 2017
In the Court of Common Pleas of Blair County
Criminal Division at No(s): CP-07-CR-0002382-2015

BEFORE: STABILE, SOLANO, and FITZGERALD[*] JJ.

MEMORANDUM BY FITZGERALD, J.:    FILED: July 20, 2017

Appellant, Olubaya Mudada Mensah Ranger, appeals from a judgment of sentence of six to twelve months' imprisonment for knowing and intentional possession of a controlled substance.[1]  Appellant argues that the trial court erred by denying his motion to suppress baggies of cocaine removed from his pants pocket during a warrantless search.  We conclude that Appellant was subject to a valid investigative detention, and that the seizure of the cocaine was proper under the plain feel doctrine.  Accordingly, we affirm.

On October 22, 2015, police officers arrested Appellant and charged him with drug-related offenses.  On April 14, 2016, the court held a hearing

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 35 P.S. § 780-113(a)(16).

relating to Appellant's motion to suppress. In an opinion and order dated May 2, 2016, the suppression court denied Appellant's motion to suppress.

The suppression court entered the following findings of fact:

1. Sergeant Christopher Moser has been employed by the Altoona Police Department since March 1, 2015. Prior to being employed with the Altoona Police Department[,] he was employed by the Williamsburg and Tyrone Borough Police Departments.

2. Sergeant Moser was assigned to the Blair County Drug Task Force after completing his probationary period with the Altoona Police Department and also during his employment with the Williamsburg Borough Police Department.

3. Sergeant Moser has been involved in several hundred prosecutions of narcotics and hundreds of search warrants.

4. Since March 2015, Sergeant Moser has been the officer in charge of the Altoona Police Department Narcotics and Vice Unit.

5. In the summer of 2015, Sergeant Moser began an investigation of Henry Agnew.

6. During the investigation of [Agnew], [o]fficers made three or four controlled purchases of narcotics from [Agnew].

7. Sergeant Moser was aware that [Agnew] had a criminal history that involved assault convictions.

8. Sergeant Moser utilized a confidential informant ("CI") to set up a controlled purchase with expectation that the controlled purchase would occur on October 22, 2015. This was the same [CI] who had made previous controlled purchases from [Agnew] during the investigation.

9. The intent of the officers involved was to make an arrest of [Agnew] after the controlled purchase on October 22, 2015. This is commonly referred to as a "buy bust."

The officers intended to purchase an eight ball of cocaine (1/8 of an ounce) for $250.00.

10. The purchase of 1/8 ounce of cocaine from [Agnew] would be the largest amount of controlled substances purchased from [Agnew] during the investigation.

11. [Because] the officers intended to conduct a "buy bust", two or three different surveillance vehicles with two officers in each vehicle were utilized during the October 22, 2015 buy bust. The Altoona Police Department also had a marked unit from Logan Township assisting.

12. Once the [o]fficers began the investigation on October 22, 2015, the [CI] indicated that [Agnew] wanted the [CI] to meet him at the Logan Towne Centre. In light of the fact that several businesses would be open for business, public safety was a concern for the officers.

13. Sergeant Moser believes that weapons are always a concern in conducting a "buy bust" operation with a suspected narcotics dealer.

14. [Because] the controlled purchase was expected to occur at the Logan Towne Center, officers were given assignments in and around Logan Towne Centre. The normal procedures of searching the [CI]'s person and his vehicle occurred and the [CI] was provided buy money. He was also followed to the Logan Towne Centre area.

15. When arriving at Logan Towne Centre, the [CI] initially parked in the area of Dick's Sporting Goods. Officers took surveillance locations around this area so they were able to view the [CI]. Sergeant Moser parked close to the Verizon Store which was north of the location where the [CI] parked.

16. At his surveillance location, Sergeant Moser received a text from the [CI] stating that he was to meet [Agnew] at the Verizon Store. Sergeant Moser witnessed [Agnew] walking toward the Verizon Store. Sergeant Moser also witnessed the [CI] exit his vehicle and meet [Agnew].

17.  Sergeant Moser witnessed an exchange occur between the [CI] and [Agnew] and the [CI] returned to his vehicle. [Agnew] then walked towards the area of Panera Bread.[2]

18.  The [CI] informed Sergeant Moser that [Agnew] told the [CI] that he had to go meet his "dude" to get the cocaine.  The [CI] told Sergeant Moser that he was waiting for him to return.

19.  Eventually, [Agnew] came back into view of the officers after being in the area of Panera Bread.  The officers then observed the [CI] pick up [Agnew] and drive around.

20.  The officers followed the vehicle . . . . After the vehicle . . . drove behind the Logan Towne Centre complex, the [CI] stopped and [Agnew] exited the vehicle at Panera Bread.  The [CI] then contacted Sergeant Moser.

21.  Sergeant Moser [instructed] the [CI] to park at Boscovs and Corporal Plummer would get in the vehicle with him.  Sergeant Moser also observed [Agnew enter] Panera Bread.

22.  Sergeant Moser was informed that the [CI] received the eight ball of cocaine from [Agnew].

23.  Pennsylvania Attorney General Agent Thomas Brandt conducted surveillance from inside the Panera Bread store.

24.  Agent Brandt maintained consistent phone contact with Sergeant Moser and informed him that [Agnew] was with a black male and white female.

25.  Based on the observations made by Sergeant Moser and the actions of [Agnew] as well as the surveillance conducted by Agent Brandt, Sergeant Moser believed that the male individual with [Agnew] in the Panera Bread store was [Agnew]'s source for his cocaine.

---

[2] There was no testimony during the suppression hearing that any officer saw Agnew enter Panera Bread at this time.  Sergeant Moser testified that "we lost [Agnew] in the area of Panera Bread."  N.T., 4/14/16, at 28.

26. Once [Agnew] exited the Panera Bread store, officers took him into custody and arrested him for the delivery charge.

27. Officers also detained [Appellant] and a female Rachel Gray. Agent Brandt had notified the officers that the individuals were leaving the Panera Bread prior to officers taking the individuals into detention.

28. When [Agnew] was taken into custody by the officers and searched incident to arrest he was found to have $50.00 of buy money on his person.

29. Altoona Police Department Officer Dan Vasil was the individual who made contact with [Appellant] after the officers approached the three individuals.

30. Patrolman Vasil has worked for the Altoona Police Department for seven years.

31. Patrolman Vasil was part of the arrest team and was also assigned to conduct transport. The three individuals, [Agnew], [Appellant] and [Gray,] entered a red Dodge Charger after exiting Panera Bread. Patrolman Vasil parked his cruiser in a position near the driver's side rear.

32. As Patrolman Vasil approached the Charger, [Appellant] opened the door and moved as if he was going to exit the Charger.

33. At that point, Patrolman Vasil and Patrolman Hanelly ordered [Appellant] to continue exiting and to place his hands on his head. Patrolman Vasil physically attempted to move [Appellant's] hands up [but] when [Appellant] got close to where Patrolman Vasil wanted his hands to be, [Appellant] began to tense his arms as though he was going to pull away. These actions caused Patrolman Vasil to believe that [Appellant] was going to fight or run.

34. As a result of [Appellant's] actions, Patrolman Vasil placed him in handcuffs. While Officer Vasil was placing him into handcuffs, Patrolman Crist read [Appellant] his *Miranda* warnings.

35. After placing [Appellant] in handcuffs, Patrolman Vasil began to pat down [Appellant's] clothing for weapons. Patrolman Vasil removed a cell phone from [Appellant's] front sweatshirt pocket. This cell phone later was found to contain a bag of cocaine.[3]

36. When Patrolman Vasil was patting down [Appellant's] left front jeans pocket, he recognized that the pocket contained knotted bags containing a powdery substance that he believed to be cocaine. Patrolman Vasil removed the bags and found them to be apparent powdered cocaine of an approximate eight ball size. There were nine bags total. After locating the cocaine, Patrolman Vasil also found $200.00 in [Appellant's] right front pocket.

37. Patrolman Vasil indicated that there [were] approximately five officers in or around the area of [Appellant] during his interaction with [Appellant].

Suppression Ct. Op., 5/2/16, at 2-7.

The suppression court found the testimony of Sergeant Moser and Patrolman Vasil "credible in all respects." *Id.* at 9. The court declined to suppress the cocaine recovered by Patrolman Vasil because (1) Appellant's stop was an investigative detention instead of a custodial arrest, (2) Appellant's pat down was constitutional, and (3) Patrolman Vasil "immediately recognized" the contraband. *Id.* at 11.

_____

[3] The suppression hearing transcript does not establish whether the discovery of the bag of cocaine in the cell phone occurred before or after Patrolman Vasil searched Appellant's pants pocket. In any event, Appellant does not argue that the seizure of the cell phone, or the discovery of the bag of cocaine therein, tainted the subsequent frisk of his pants pocket or seizure of the bags of cocaine from his pocket.

- 6 -

On September 9, 2016, the case proceeded to a non-jury trial before a different judge than the judge who presided over suppression proceedings. The trial court found Appellant guilty of one count of possession of a controlled substance. On January 6, 2017, the court imposed sentence. Appellant timely appealed, and both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises three issues in this appeal:

> I. Whether the suppression court erred and/or abused its discretion when it denied Appellant's motion to suppress when it found that the Appellant was in an "investigative detention" and not a "custodial detention" and when it further allowed inadmissible hearsay [into] the suppression hearing and relied on said inadmissible hearsay as substantive fact to support its denial of Appellant's motion to suppress?
>
> II. Whether the suppression court erred and/or abused its discretion when it determined that Appellant's suppression [motion] be denied when it found that Officer Vasil's search of [Appellant] was a legal search?
>
> III. Whether the trial court erred and/or abused its discretion when it did not overrule the suppression court's ruling?

Appellant's Brief at 4.

In essence, Appellant raises three arguments: (1) the suppression court erroneously admitted hearsay during the suppression hearing; (2) Appellant's stop was a custodial detention instead of an investigative detention, but the police officers lacked probable cause to conduct a custodial detention; and (3) even if the stop was an investigative detention,

Patrolman Vasil's search was invalid under the plain feel doctrine, because he did not immediately recognize the items on Appellant's person as contraband. We examine each of these issues below.

When the defendant files a motion to suppress, "it is the Commonwealth's burden to prove, by a preponderance of the evidence, that the challenged evidence was not obtained in violation of the defendant's rights." **Commonwealth v. Wallace**, 42 A.3d 1040, 1047-48 (Pa. 2012) (citations omitted). When this Court addresses a challenge to the denial of a suppression motion,

> [we are] limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, [the appellate court is] bound by [those] findings and may reverse only if the court's legal conclusions are erroneous. Where . . . the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of the courts below are subject to [ ] plenary review.

**Commonwealth v. Jones**, 121 A.3d 524, 526–27 (Pa. Super. 2015) (citation omitted). When reviewing the suppression court's rulings, we consider only the suppression record. **See In re L.J.**, 79 A.3d 1073, 1085 (Pa. 2013) ("it is inappropriate to consider trial evidence as a matter of

course, because it is simply not part of the suppression record, absent a finding that such evidence was unavailable during the suppression hearing").

Moreover,

> the admissibility of evidence rests within the sound discretion of the trial court, whose decision we will not disturb absent a showing that its discretion has been abused. Discretion is abused when the course pursued [by the trial court] represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias, or ill will.

*Commonwealth v. Dargan*, 897 A.2d 496, 500 (Pa. Super. 2006) (citations and quotation marks omitted).

Appellant contends that the suppression court erred in denying his motion to suppress on the basis of inadmissible hearsay, namely statements by the CI to the police officers during the "buy bust" operation about what Agnew said to the CI. We conclude that these statements were not hearsay, because they were not admitted for their truth but to explain the police officers' course of conduct.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Pa.R.E. 801(c). "An out of court statement offered not for its truth but to explain the witness's course of conduct is not hearsay." *See Commonwealth v. Rega*, 933 A.2d 997, 1017 (Pa. 2007) (trooper's testimony that on morning following murder, codefendant had told trooper

that he and defendant dropped defendant's daughters off at defendant's mother's home before leaving together, was not inadmissible hearsay, where Commonwealth introduced testimony to explain reason for further investigating codefendant and defendant); *Commonwealth v. Sneed*, 526 A.2d 749, 754 (Pa. 1987) (police officer's testimony describing radio call that prompted his trip to crime scene was not hearsay because it was introduced solely to explain why he went to scene); *Commonwealth v. Estepp*, 17 A.3d 939, 945 (Pa. Super. 2011) (police officer's testimony regarding statements by confidential informant admissible to explain officer's course of conduct in investigating drug sales); *Dargan*, 897 A.2d at 500, 502 (officer's testimony as to out-of-court statements made to him by confidential informant, consisting of report that heroin could be purchased from defendant, description of defendant and his automobile, his address, and name of his girlfriend, admissible for purpose of explaining officer's acts in connection with his investigation).

Here, the CI sent multiple text messages to police officers during the buy bust operation concerning the location of his meeting with Agnew as well as Agnew's statement that he had to meet his "dude" to obtain the cocaine. These text messages were admissible to explain the police officers' course of conduct in tracking the CI's and Agnew's whereabouts and

ultimately stopping Agnew, Appellant and Gray outside of Panera Bread. Thus, no relief is due.[4]

In his second issue, Appellant argues that the suppression court erred by determining that the police officers subjected him to an investigative detention instead of a custodial detention. Appellant insists that the officers conducted a custodial detention for which probable cause did not exist. The suppression court held that the officers conducted an investigative detention and reasoned, in the alternative, that probable cause existed for a custodial detention. While the court did not explicitly address whether the officers had reasonable suspicion to conduct an investigative detention, it implicitly determined that they had reasonable suspicion by concluding that they satisfied the steeper burden of probable cause.

We uphold the suppression court's decision but for slightly different reasons—specifically, the officers had reasonable suspicion to conduct an investigative detention. *See Commonwealth v. Judge*, 916 A.2d 511, 517 n.11 (Pa. 2007) ("this Court may affirm on any ground") (citation omitted).

> Fourth Amendment jurisprudence has led to the development of three categories of interactions between citizens and the police. The first of these is a "mere encounter" (or request for information) which need not be

---

[4] Appellant points out that the trial court, unlike the suppression court, held that the CI's statements were inadmissible hearsay. Nevertheless, "the record of the suppression hearing is intended to be the complete record for suppression issues . . . ." *L.J.*, 79 A.3d at 1084. Having reviewed the suppression record, we think the suppression court's decision was a proper exercise of its discretion.

supported by any level of suspicion, but carries no official compulsion to stop or to respond. *See Florida v. Royer*, 460 U.S. 491 (1983); *Florida v. Bostick,* 501 U.S. 429, (1991). The second, an "investigative detention[,]" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. *See Berkemer v. McCarty,* 468 U.S. 420 (1984); *Terry v. Ohio,* 392 U.S. 1 (1968). Finally, an arrest or "custodial detention" must be supported by probable cause. *See Dunaway v. New York,* 442 U.S. 200 (1979); *Commonwealth v. Rodriguez,* 614 A.2d 1378 ([Pa.] 1992).

*Commonwealth v. Ellis,* 662 A.2d 1043, 1047–48 (Pa. 1995) (footnote

and parallel citations omitted).

Reasonable suspicion is a less stringent standard than probable cause necessary to effectuate a warrantless arrest, and depends on the information possessed by police and its degree of reliability in the totality of the circumstances. In order to justify the seizure, a police officer must be able to point to specific and articulable facts leading him to suspect criminal activity is afoot. In assessing the totality of the circumstances, courts must also afford due weight to the specific, reasonable inferences drawn from the facts in light of the officer's experience and acknowledge that innocent facts, when considered collectively, may permit the investigative detention.

\* \* \*

The determination of whether an officer had reasonable suspicion that criminality was afoot so as to justify an investigatory detention is an objective one, which must be considered in light of the totality of the circumstances. It is the duty of the suppression court to independently evaluate whether, under the particular facts of a case, an objectively reasonable police officer would have reasonably suspected criminal activity was afoot.

***Commonwealth v. Holmes****,* 14 A.3d 89, 95, 96 (Pa. 2011) (internal citations, quotations, and emphasis omitted).

A wide variety of circumstances may give rise to reasonable suspicion to conduct an investigative detention for a suspected drug sale. ***See***, ***e.g.***, ***Commonwealth v. Thompson***, 93 A.3d 478, 485-86 (Pa. Super. 2014) (police officer had reasonable suspicion to believe that defendant was engaged in drug-related crime, where officer engaged in surveillance of convenience store after concerned citizens complained of suspected narcotics activity near store, officer observed defendant signal to driver in another vehicle in store parking lot and then leave the lot, officer followed defendant to nearby location at which defendant approached and entered vehicle that appeared to be waiting for him, and officer observed defendant receive cash from passengers in vehicle, exit vehicle and retrieve plastic baggie from hiding place next to nearby fence, and toss baggie into vehicle); ***Commonwealth v. Clemens***, 66 A.3d 373, 380 (Pa. Super. 2013) (police officer had reasonable suspicion necessary to detain defendant after suspected drug transaction; officer who had significant experience in investigating drug offenses witnessed defendant engage in hand-to-hand narcotics transaction with another individual in high-crime area, and, when defendant made eye contact with officer after transaction, he fled and was next seen sitting on porch of home to which he had no connection).

In addition, information provided by a tipster can help establish reasonable suspicion for an investigative detention. *See Commonwealth v. Ranson*, 103 A.3d 73, 78-79 (Pa. Super. 2014) (tip from nightclub patron while police officer was working security detail at club in high-crime area, identifying defendant and stating that he was carrying firearm, was legitimate factor upon which officer could rely in determining that reasonable suspicion existed to stop defendant even though officer did not know informant's name; officer had seen tipster on regular basis because he was patron at club every weekend, officer had opportunity to observe tipster's demeanor and assess his credibility in light of his eighteen years of experience as police officer, and tipster gave specific tip pointing out defendant).

Here, reasonable suspicion existed to stop Appellant outside of the Panera Bread restaurant. Sergeant Moser, who had significant experience in drug trafficking investigations, previously had used a reliable CI to make controlled purchases of cocaine from Agnew. Law enforcement officials arranged a buy/bust in which the same CI would purchase cocaine from Agnew, and Agnew would be arrested. Multiple officers conducted surveillance in the vicinity of the buy-bust. The CI was observed meeting Agnew, who told the CI that he had to meet his "dude" to get the cocaine. Agnew walked to the area of Panera Bread, where the officers briefly lost sight of Agnew. The CI waited in his car for Agnew to return. Eventually,

Agnew came back into view, the CI picked Agnew up, and they drove around. The CI dropped off Agnew near Panera Bread, and the CI contacted Sergeant Moser and reported that he had just purchased cocaine from Agnew. A law enforcement official observed Agnew inside Panera Bread eating with a black male and a white female. Sergeant Moser believed the male at Panera Bread was the "dude" who supplied cocaine to Agnew. Agnew, the male and the female exited Panera Bread and entered a red Dodge Charger, but Patrolman Vasil stopped the vehicle from leaving. Collectively, the CI's history of reliability, his report that Agnew needed to see his "dude" to obtain cocaine followed by his walk near Panera Bread, the controlled purchase of cocaine, Agnew's entry into Panera Bread after the controlled purchase, and Agnew's meeting with a male and female inside Panera Bread provided reasonable suspicion that the male (Appellant) was the supplier of Agnew's cocaine.

Further, the police officers only conducted an investigative detention, which only required reasonable suspicion, instead of a custodial detention, which would have required probable cause. "The key difference between an investigative and a custodial [detention] is that the latter involves such coercive conditions as to constitute the functional equivalent of an arrest." *Commonwealth v. Pakacki*, 901 A.2d 983, 987 (Pa. 2006) (citation and internal quotation omitted). In determining whether an encounter with the police is custodial, "[t]he standard . . . is an objective one, with due

consideration given to the reasonable impression conveyed to the person interrogated rather than the strictly subjective view of the troopers or the person being seized," and "must be determined with reference to the totality of the circumstances." ***Commonwealth v. Edmiston***, 634 A.2d 1078, 1085–86 (Pa. 1993).

> The court considers the totality of the circumstances to determine if an encounter is investigatory or custodial, but the following factors are specifically considered: the basis for the detention; the duration; the location; whether the suspect was transported against his will, how far, and why; whether restraints were used; the show, threat or use of force; and the methods of investigation used to confirm or dispel suspicions.

***Commonwealth v. Teeter***, 961 A.2d 890, 899 (Pa. Super. 2008) (citation omitted).

The suppression court observed that the officers only subjected Appellant to an investigative detention:

> The basis of the detention in this case was to further [the officers'] investigation of [Appellant] and for officer safety. It also occurred in a public location[,] further requiring the actions to be made for public safety purposes. The suspect was not transported to that location but was at that location of his own free will. In addtion, the length of the detention was brief[,] and there was no evidence established at the evidentiary hearing . . . that there was any significant use of force.

Suppression Ct. Op. at 10-11. We agree with this reasoning.

Appellant argues that the stop was a custodial detention because he was placed in handcuffs, and because Sergeant Moser admitted during trial that a "custodial detention" took place. Appellant's Brief at 16 (citing

Reproduced Record at 109). Neither argument has merit. Handcuffing a suspect for officer safety does not transform a stop into a custodial detention. *See Commonwealth v. Rosas*, 875 A.2d 341, 348 (Pa. Super. 2005) (citations omitted). Here, handcuffing Appellant "was merely part and parcel of ensuring the safe detaining of the individual[] during [a] lawful *Terry* stop," *id.*, and did not constitute an arrest. Moreover, Sergeant Moser's reference to a "custodial detention" during trial is of no moment. As discussed above, the suppression hearing record is the complete record for suppression issues, so trial testimony falls outside our scope of review on this issue. In any event, the determination of whether the stop was an investigative detention or custodial detention is an objective inquiry, *Edmiston*, 634 A.2d at 1085–86, that does not turn upon the subjective viewpoint of a testifying police officer.

Finally, Appellant argues that Patrolman Vasil's search was invalid under the plain feel doctrine, because he did not immediately recognize the items in Appellant's pocket as contraband. We disagree.

Under the plain feel doctrine,

> a police officer may seize non-threatening contraband detected through the officer's sense of touch during a *Terry* frisk if the officer is lawfully in a position to detect the presence of contraband, the incriminating nature of the contraband is immediately apparent from its tactile impression and the officer has a lawful right of access to the object. [T]he plain feel doctrine is only applicable where the officer conducting the frisk feels an object whose mass or contour makes its criminal character immediately apparent. Immediately apparent means that

- 17 -

> the officer readily perceives, without further exploration or searching, that what he is feeling is contraband. If, after feeling the object, the officer lacks probable cause to believe that the object is contraband without conducting some further search, the immediately apparent requirement has not been met and the plain feel doctrine cannot justify the seizure of the object.

*Pakacki*, 901 A.2d at 989 (citations omitted). The plain feel exception is satisfied when the officer feels both packaging material and drugs while patting down the defendant's outer garments. In *Commonwealth v. Parker*, 957 A.2d 311 (Pa. Super. 2008), the officer conducting the pat down felt two plastic bags in the defendant's cargo pocket with some "hard, rigid objects" that he believed were crack cocaine based on his training and experience. We upheld the seizure of the drugs because the officer immediately identified the object he felt as contraband (packaged crack cocaine) before reaching into the defendant's pocket and looking at its contents. *Parker*, 957 A.2d at 316. Similarly, in *Commonwealth v. Bryant*, 866 A.2d 1143 (Pa. Super. 2005), we upheld a search where the officer conducting the pat down immediately recognized the object as packaged drugs due to his experience in over 100 drug arrests and his familiarity with the packaging and feel of packaged drugs.[5] *Bryant*, 866 A.2d at 1147.

---

[5] Conversely, the plain feel exception is not satisfied when the officer only feels a pill bottle, *see Commonwealth v. Guillespie*, 745 A.2d 654, 658 (Pa. Super. 2000), or only a zip-lock baggie, *see Commonwealth v. Stackfield*, 651 A.2d 558, 562 (Pa. Super. 1994) ("[a] zip-lock baggie is not

Here, the suppression court determined that Patrolman Vasil immediately recognized the items in Appellant's pocket as contraband. The record supports this determination. Patrolman Vasil placed his hand on Appellant's pocket and pressed "pretty hard." N.T., 4/14/16, at 56. He immediately felt plastic bags with tied corners and a powdery substance inside them. *Id.* Based on his extensive experience performing such searches, but without manipulating or moving these items around, he immediately recognized that they were contraband. *Id.* at 55-56, 61. Accordingly, he lawfully removed these items from Appellant's pocket.

For these reasons, the trial court properly denied Appellant's motion to suppress.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/20/2017

---

per se contraband, although material contained in a zip-lock baggie may well be").