J-A19006-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| BRAHEEM A. OWENS, | |
| Appellant | No. 289 EDA 2016 |

Appeal from the Judgment of Sentence Entered August 14, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0008144-2014

BEFORE:  BENDER, P.J.E., DUBOW, J., and MUSMANNO, J.

MEMORANDUM BY BENDER, P.J.E.:          **FILED OCTOBER 03, 2017**

Appellant, Braheem A. Owens, appeals from the judgment of sentence of an aggregate term of 28½ - 57 years' incarceration, imposed following his conviction for third-degree murder and related offenses.  Appellant contends that the evidence was insufficient to disprove his claim of self-defense, and that the trial court erred by permitting the prosecutor to cross-examine him in violation of his right to remain silent.  After careful review, we affirm.

Appellant was arrested following the shooting death of Aaron Johnson in West Philadelphia on May 24, 2014.  The circumstances of the shooting, Appellant's subsequent flight from the scene, his apprehension by authorities soon thereafter, as well as other evidence presented at trial, are described in detail in the trial court's Pa.R.A.P. 1925(a) opinion.  *See* Trial Court Opinion (TCO), 4/14/16, at 3-12.  Following his arrest, the Commonwealth charged

Appellant with third-degree murder, 18 Pa.C.S. § 2502(c); carrying a firearm without a license, 18 Pa.C.S. § 6106; carrying a firearm in public in Philadelphia, 18 Pa.C.S. § 6108; possession of an instrument of crime, 18 Pa.C.S. § 907; and fleeing or attempting to elude a police officer, 75 Pa.C.S. § 3733. Appellant and a co-defendant were tried before a jury from May 19-27, 2015. The jury convicted Appellant on all counts.

Appellant filed a timely appeal, as well as a timely, court-ordered Rule 1925(b) statement. The trial court issued its Rule 1925(a) opinion on April 14, 2016. Appellant now presents the follow questions for our review:

  I. Did the trial court err by permitting the prosecutor, over defense counsel's objection, to question [Appellant] … regarding his post-arrest silence in violation of [his] rights under the Fifth Amendment to the United States Constitution and Article 1, Section 9 of the Pennsylvania Constitution?

  II. Was the evidence insufficient as a matter of law to support [Appellant]'s conviction for third[-]degree murder because the Commonwealth failed to present sufficient evidence to disprove that [he] acted in self-defense beyond a reasonable doubt or that he otherwise acted with malice?

Appellant's Brief at 4.

After careful consideration of the record, the parties' briefs, and the thorough and well-reasoned decision of the Honorable Genece E. Brinkley, we affirm on the basis of the trial court's decision, and adopt that opinion as

our own.[1] **See** TCO at 12-17 (Issue I); 18-23 (Issue II). We specifically note that we agree with the trial court that Appellant's framing of his first

---

[1] In Appellant's 1925(b) statement, he also challenged the sufficiency of the evidence supporting his conviction for fleeing or attempting to elude a police officer, 75 Pa.C.S. § 3733. In its opinion, the trial court indicates that it agrees that the Commonwealth's evidence was insufficient to support that conviction, and suggests it is willing to vacate Appellant's conviction for that offense if or when it has jurisdiction to do so. **See** TCO at 2 n.1. Shockingly, Appellant has effectively abandoned the issue in his brief, as he did not list this issue in his "Statement of the Questions Presented," nor did he address the matter in the "Argument" portion of his brief. He only mentions the matter twice in his brief, but without any significant development of the claim.

First, in his "Statement of the Case," he states:

In its opinion, the trial court conceded that the evidence was insufficient to support [Appellant]'s conviction for fleeing or attempting to elude police. The trial court, however, claimed that it was without authority to vacate this particular conviction because the case is now on appeal.

Based on the trial court's position, [Appellant] will not brief the issue regarding the insufficiency of the evidence to support his fleeing or attempting to elude police conviction. However, he will ask this Court on appeal to reverse his conviction for this offense based on the reasons set forth in the trial court's opinion.

Appellant's Brief at 14. Second, under the "Conclusion" section of his brief, Appellant requests that his Section 3733 conviction be reversed by this Court on sufficiency grounds. **Id.** at 35. Nowhere in Appellant's brief does he provide any development of this claim, nor citation to pertinent authorities.

"Arguments that are not appropriately developed are waived." **Nimick v. Shuty**, 655 A.2d 132, 138 (Pa. Super. 1995). Moreover, "[t]he argument portion of an appellate brief must include a pertinent discussion of the particular point raised along with citation to pertinent authorities."
*(Footnote Continued Next Page)*

issue is misleading, as the record supports the court's determination that Appellant was cross-examined about his pre-arrest, not post-arrest silence, because he was only subjected to an investigative detention at the relevant time.

Judgment of Sentence **affirmed**.

*Judgment Entered.*

Joseph D. Seletyn, Esq.
*Prothonotary*


Date: <u>10/3/2017</u>

*(Footnote Continued)* ─────────

**Commonwealth v. Rodgers**, 605 A.2d 1228, 1239 (Pa. Super. 1992) (citing Pa.R.A.P. 2119(a)).

Unfortunately, we are compelled to conclude that Appellant's Section 3733 sufficiency claim has been waived on this basis. Appellant's only remedy for counsel's error is now through the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541-9546.

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

COMMONWEALTH : CP-51-CR-0008144-2014

**FILED**

vs.

APR 1 4 2016

Criminal Appeals Unit
First Judicial District of PA

SUPERIOR COURT
BRAHEEM OWENS : 2895 EDA 2016

OPINION

BRINKLEY, J. APRIL 14, 2016

A jury found Defendant Braheem Owens guilty of Third-degree Murder; two violations of the Uniform Firearms Act (VUFA): Carrying a Firearm Without a License, §6106, and Carrying a Firearm on the Street or Public Place in Philadelphia, § 6108; Possession of an Instrument of Crime (PIC); and Fleeing or Attempting to Elude Police Officer. This Court sentenced him to an aggregate sentence of 28 ½ to 57 years state incarceration. Defendant appealed this judgment of sentence and raised the following issues for appellate review: (1) whether the trial court erred when it permitted the Commonwealth to question Defendant regarding his "post-arrest silence in violation of the defendant's rights under the Fifth Amendment to the United State Constitution and Article 1, Section 9 of the Pennsylvania Constitution"; (2) was the evidence sufficient to support Defendant's conviction for Third Degree Murder; and (3) whether the evidence was sufficient to support Defendant's conviction

for fleeing or attempting to elude police officer. This Court's judgment of sentence should be affirmed.[1]

## PROCEDURAL HISTORY

On May 24, 2014, decedent Aaron Johnson was shot multiple times near his home on the 1300 block of North Frazier Street in Philadelphia. Defendant and his co-defendant Lanier James ("James") were arrested and charged in connection with this murder. From May 19 to 27, 2015, Defendant and James appeared before this Court for a jury trial. The jury found Defendant guilty of Third Degree Murder, VUFA § 6106, VUFA § 6108, PIC, and fleeing or attempting to elude police.

On August 14, 2015, this Court sentenced Defendant as follows:

| | |
|---|---|
| Third Degree Murder: | 20 to 40 years state incarceration |
| VUFA § 6106: | 3 ½ to 7 years state incarceration |
| VUFA § 6108: | 2 ½ to 4 years state incarceration |
| PIC: | 2 ½ to 4 years state incarceration |
| Fleeing/Attempting to Elude Police: | No further penalty |

---

[1] After careful review of the record, this Court has determined that defense counsel failed to move for a judgment of acquittal with respect to the charge Fleeing or Attempting to Elude Police Officer, 75 Pa.C.S.A. § 3733. Nor did he challenge this conviction in the Motion for Reconsideration filed August 24, 2015. Thus, this Court did not have an opportunity to correct this issue while it was still within this Court's jurisdiction. Notwithstanding, this Court conducted research into the matter and it would appear that the jury's verdict with respect to this charge was not supported by sufficient evidence. According to 75 Pa.C.S.A. § 3733, as well as supporting case law, the accused must be the "driver of a motor vehicle who willfully fails or refuses to bring his vehicle to a stop, or who otherwise flees or attempts to elude a pursuing police officer, when given a visual and audible signal to bring the vehicle to a stop." The record shows that Defendant was never the driver of the vehicle; he rode in the front passenger seat. Thus, even though no further penalty was imposed on this charge, this Court would vacate the jury's verdict on this charge if it had jurisdiction to do so. However, the Superior Court may consider vacating the jury's decision, even though defense counsel did nothing to correct this mistake sooner.

2

These sentences were to run consecutively with one another, for an aggregate sentence of 28 ½ to 57 years state incarceration. Defendant was not Recidivism Risk Reduction Incentive (RRRI) eligible. This Court ordered Defendant to receive drug and mental health treatment while incarcerated, and upon release, complete job training, seek and maintain employment, stay out of trouble with the law, and pay mandatory court costs.

On August 24, 2015, Defendant filed a post sentence motion for reconsideration. This motion was denied by operation of law on January 4, 2016. Prior to this, on September 20, 2015, Defendant had filed a Notice of Appeal to Superior Court; this was quashed as interlocutory by the Superior Court on October 20, 2015. On January 11, 2016, Defendant filed a timely Notice of Appeal. On January 14, 2016, this Court ordered that defense counsel file a Concise Statement of Errors Complained of on Appeal Pursuant to Pa.R.A.P. 1925(b) and defense counsel did so on February 1, 2016.

## FACTS

On May 28, 2014, at approximately 11:45 a.m., decedent Aaron Johnson ("Johnson") was shot multiple times after merely sitting on a bicycle and talking with friends gathered on a nearby front porch on the 1300 block of Frazier Street in West Philadelphia.

A jury trial in this matter commenced on May 19, 2015. The Commonwealth first called Police Officer George Williams to testify. Officer Williams stated that he was in uniform, in his marked patrol car, when he heard several gunshots. As he approached the corner of Frazier and Thompson Streets, he saw a black male running and firing at a group of males. Officer Williams identified Defendant as the shooter. Defendant ran behind a parked Nissan Maxima and continued to fire his weapon. Defendant then entered the vehicle's passenger side. Officer Williams exited his vehicle and approached the driver's side of the Nissan with his gun drawn.

3

He described the driver as a lighter skinned black male. Officer Williams testified that his plan was to hold the car at gunpoint until back up officers arrived on the scene. However, there was just enough space for the car to get past him and speed down the block. He chased the car for a half a block, shouting into his radio to update fellow officers on the situation and provide a description of the car and suspects. After his radio fell off his belt, Officer Williams decided to turn around and attend to the victim. (N.T. 5/19/15, p. 71-104).

Brandon Woods ("Woods") testified next. He stated that he was a neighborhood friend to the decedent Aaron Johnson, and that on the day of the shooting, he was at home on the 1300 block of Frazier Street. He testified that Johnson was riding Woods' bicycle outside on the street. Woods stated that he saw Anthony Evans (a/k/a Anthony Johnson) and Shuron Briggs outside on the porch, and then Woods went inside his house. Approximately 5-10 minutes later, he heard several gunshots. Evans ran into Woods' house and everyone hid on the floor. After waiting a few minutes, Woods went outside to see what had happened and saw his bicycle in the street and Johnson lying on the ground. Id. at 154-171.

Anthony Evans (a/k/a/ Anthony Johnson) ("Evans") testified next. He stated that on the day of the shooting, he was outside alone on his front porch on the 1300 block of North Frazier Street. A group of 8 to 10 men, including Shuron Briggs and a man named "Eric," was outside on the adjacent porch. Evans saw Johnson sitting on Woods' bicycle, speaking to one of the men on the porch. Evans testified that he then went inside to eat lunch. After a few minutes, he heard gunfire. When the shooting subsided, Evans ran outside and saw Johnson lying in the street. Evans denied seeing men running down the street with firearms, even though that was what he originally said in his statement to homicide detectives. Id. at 189-220. In his original statement to police, Evans had described the event as follows:

4

I was on my porch with my friends Eric and Drew on the porch at [address redacted] and there was a bunch of young guys sitting out smoking weed. I went in the house to cook some food that I had from last night. When I came outside a couple minutes later with my food—and then a couple minutes later I see three guys coming down the block from Master Street. I see that two of the guys are carrying guns, and all the guys on the porch next door start running in the house, and some of them run down the block. I see the guys with the gun in front of 1227 standing in the middle of the street and they are shooting. I run in the house and waited for the shooting to stop, and when I came out, I see the guys running back up towards Master Street. I see the police car at Frazier and Thompson Street. I run down the block, and I see Aaron laying in the street, and he was breathing a little bit and he was bleeding bad. Then the police put Aaron in the police wagon and went down Thompson Street.

Id. at 221-222. In his police statement, Evans further described the gunmen as "black males with black hoodies. I think the one had a black shirt on...They both had black guns, and they were holding them in their right hand...After this shooting stopped, I came out of my house. The three guys were standing outside of 1327 in the middle of the street. Then they started running towards Master Street. That's where Aaron got shot. He ran in that direction." Id. at 223-224.

Homicide Detective Brian Peters testified next. He stated that he interviewed Evans on the day of the murder. Detective Peters testified that at the time of the interview, Evans was not impaired or under the influence of any substance. He further testified that he did not suggest any answers to Evans, and that he did not know at that time what evidence had been seized by police in connection with this crime. Last, Detective Peters testified that Evans carefully reviewed each question and answer provided during the interview, and signed the statement at the bottom. (N.T. 5/20/15, p. 5-27).

Shuron Briggs ("Briggs") testified next for the Commonwealth. He stated that on the morning of the shooting, he was standing on a front porch with some friends, including Anthony Evans, talking about sports. He heard gunshots, so he jumped over the railing with two friends

5

and hid on the ground. Briggs testified that Brandon Woods was inside the house the entire time, not outside on the porch. Briggs further testified that his back was turned towards the street and that he never saw the decedent Johnson in the area. After the gunshots ended, Briggs and his friends ran through the alleyway and into a house. They returned outside and saw Johnson lying in the street. Briggs testified that he spoke with homicide detectives the following week and gave a formal statement to police. He told detectives that based upon the gunfire, he believed there were two shooters but he did not see their faces. Id. at 62-94.

Next, Detective Edward Tolliver testified. He stated that he and Detective Moles interviewed Briggs in connection with the murder of Aaron Johnson. He reviewed the written statement and confirmed that Briggs told him he believed there were two shooters, although he did not see them. Id. at 116-143.

Police Officer Ryan Mundrick testified that on May 28, 2014, he was on duty in an unmarked police car at the intersection of 60th and Thompson Streets when he received a radio call regarding a shooting on the 1300 block of North Frazier Street. The radio call included a flash description of the shooting suspects: two black males traveling west on Thompson Street in a red or burgundy Nissan bearing out-of-state license plates. Officer Mundrick stated that he pulled up closer to the intersection so he could observe oncoming traffic better. Almost immediately, he saw a burgundy Nissan Maxima speeding down Thompson Street, flying through stop signs and swerving as though the driver was not in complete control of the vehicle. Officer Mundrick stated that he followed the car when it turned north onto Hobart Street, and pulled up behind it when parked near the corner of Hobart and Thompson Streets. He testified that he saw James exit the driver's side of the vehicle and saw Defendant exit the passenger side. James was wearing light gray sweat pants and a hooded sweatshirt with a black t-shirt

6

underneath. Officer Mundrick stated that James and Defendant looked directly at him after they exited their vehicle and then began to run north on Hobart Street. He followed them and saw them turn into an abandoned lot near the middle of the block. Officer Mundrick then turned south onto Wanamaker Street and saw James, now wearing just light gray sweatpants and a black t-shirt, run down Wanamaker and then sit down on the front steps of a house. Officer Mundrick drove towards James, who was visibly out of breath, but James saw him and began to run again. As James changed directions and attempted to cross the street, he was struck by Officer Mundrick's police vehicle. Officer Mundrick, with the assistance of Officer Butler, placed James in handcuffs. He recovered a Glock handgun from the front waist area of James' pants. He further recovered a set of keys from James' pocket. Officer Butler inspected the handgun in Officer Mundrick's presence and discovered there was one round in the chamber and nothing else in the cartridge. Officer Mundrick then drove to the Nissan Maxima and made sure it was secure. He then went to 58th and Master Streets to identify a possible suspect; however, the person in question was not Defendant. Police then summoned Officer Mundrick to an abandoned house in the alleyway between Hobart and Wanamaker Streets. Officer Mundrick went into a second floor bedroom and identified Defendant as the vehicle passenger. Id. at 163-219.

Dr. Albert Chu, Assistant Medical Examiner in the Philadelphia Medical Examiner's Office, testified next for the Commonwealth. He stated that he reviewed the autopsy report and photos prepared by Dr. Marlon Osbourne, a medical examiner no longer employed by the city. Based upon his expertise, Dr. Chu testified that Aaron Johnson died from two gunshot wounds—one to the back and the other to the hip. The bullet that entered his back struck his left lung and aorta. The bullet that entered his hip exited to the right of his groin. Dr. Chu testified that the shot

7

to the back was fatal and that Johnson's manner of death was in fact homicide. (N.T. 5/21/15, p. 14-26.

Next, Police Officer Roland Butler testified. He stated that on May 28, 2014, he received a radio call from Officer Williams regarding a shooting in progress. He then heard Officer Mundrick come over the radio and inform fellow officers that he was in pursuit of two suspects. Officer Butler drove over to Officer Mundrick's location on Wanamaker Street. When he arrived, he saw Officer Mundrick struggling to place James under arrest. Officer Butler assisted with the arrest and then patted down James for weapons. He recovered a Glock .45 caliber handgun from James' front waistband. He removed the clip and there was one round loaded inside the chamber. Officer Butler testified that James' eyes were rolling back in his head and that there was a large "gash" on the back of his skull, so he called for an ambulance and James was taken to the hospital. Id. at 32-50.

Police Officer Maurice Sutherland testified next. He stated that he responded in a police wagon to the shooting on the 1300 block of North Frazier Street. When he arrived on the scene, he saw Johnson lying on the ground covered in blood, showing no signs of life. He and the other officers put on gloves, put Johnson into the wagon, and drove him to the Hospital of the University of Pennsylvania, where he was pronounced dead. Officer Sutherland testified that he was interviewed by homicide detectives regarding the transport of Johnson to the hospital. Id. at 76-87.

Police Officer Christine Hilbert took the stand and testified that she worked as part of the Crime Scene Unit. She reviewed and analyzed the Nissan Maxima used by Defendant and James to escape the crime scene. She stated that she photographed the vehicle, took DNA samples and

8

processed it for fingerprints. Officer Hilbert testified that she was able to lift 14 fingerprints from the vehicle. Id. at 90-114.

Police Officer Edward Fidler, a member of the Crime Scene Unit, testified next. He stated that he went to the 1300 block of North Frazier Street and took photographs of the crime scene, documenting the locations of the ballistic evidence markers and bloodstains in the street. Using the crime scene photographs to illustrate, Officer Fidler testified as to the area where the fired cartridge casings were located, which indicated the approximate location of the shooter(s). He later went to the Nissan Maxima on Hobart Street and took photographs of the vehicle. He also took photographs on Wanamaker Street. Id. at 158-218.

Next, the Commonwealth entered two self-authenticating documents into evidence. First, the Commonwealth entered a certificate from the Pennsylvania State Police, indicating that they had reviewed state records and determined that on May 28, 2014, Defendant did not have a valid license to carry a firearm nor did he have a valid sportsmen's permit to carry a firearm in the Commonwealth of Pennsylvania. Second, the Commonwealth entered a similar certificate from the Pennsylvania State Police indicating that on May 28, 2014, James did not have a valid license to carry a firearm nor did he have a valid sportsmen's permit to carry a firearm. (N.T. 5/22/15, p. 15-17).

Scott Copeland ("Copeland"), Forensic Scientist III in the Latent Print Unit of the Philadelphia Police Department of Criminalistics, testified next as an expert in fingerprint identification and comparison. He stated that he received the fingerprint cards collected by Officer Hilbert and compared the prints to those of the suspects in the case. After the initial comparison, Copeland determined that none of the fingerprints matched James or Defendant. His work was peer reviewed by a coworker, who agreed with his assessment. However, immediately

9

before Copeland was scheduled to come to court to testify in this matter, he reexamined the fingerprints and discovered that he had made a mistake. One of the fingerprints in the Nissan matched Defendant. Two additional forensic scientists trained in fingerprint analysis examined the fingerprints and agreed that they matched Defendant. Id. at 17-72.

Next, Police Officer Gregory Welsh testified as an expert in firearms examination. He examined the firearm recovered from James and determined that it was a Glock Model 30 .45 caliber weapon. This weapon was a fully operable, semi-automatic firearm, with gunshot residue already in the barrel. Officer Welsh also examined the cartridge that was submitted with the gun, and determined that it was a caliber .45 auto. He test-fired it and it was operable. He also examined 28 fired cartridge casings recovered from the crime scene and determined that they were of four different calibers, including: .45 caliber, 9 mm, .380 automatic, and .40 Smith and Wesson. All six of the .45 caliber fired cartridge casings matched the Glock .45 caliber firearm recovered from Defendant. Id. at 80-134.

Detective Charles Grebloski testified next. He testified that he and his partner were assigned to investigate the murder of Aaron Johnson. When he arrived at the crime scene, he canvassed the neighborhood to locate possible witnesses and security footage in the area. He and other Crime Scene Unit officers then searched the abandoned house on Wanamaker Street and were unable to recover a firearm. They also searched the surrounding area without success. After running the vehicle information through the computer system, Detective Grebloski determined that Nissan Maxima was a rental car belonging to Hertz Rent-A-Car. He further testified that he obtained search warrants for four cell phones, including those belonging to Defendant and Briggs. Id. at 158-185; (N.T. 5/26/15, p. 10-29).

At the conclusion of Detective Grebloski's testimony, the Commonwealth rested. Defense counsel made a motion for judgment of acquittal on behalf of James. He argued that the evidence was insufficient as a matter of law to sustain a verdict as to any of the charges against James. This Court denied that motion, finding that there was sufficient evidence for the case to go to the jury for deliberation. Id. at 39-40.

James' defense counsel called Cecil Landon, James' step-father, and Dolores Richardson, James' step-grandmother, to testify as character witnesses. They both testified that they had known James all his life and that he was regarded in the community as being a peaceful, non-violent person. Id. at 46-48.

Next, Defendant took the stand. He stated that on May 28, 2014, he drove in a rented Nissan Maxima from his mother's house at 57th and Spruce Streets to his friend's grandmother's house at 51st and Arch Streets. When he arrived, several friends, including James, were playing video games. At approximately 11:30 a.m., James asked Defendant to drive him to his grandmother's house in Overbrook Park. Defendant testified that James asked if he could drive since he was more familiar with the area. As they drove near the intersection of Frazier and Thompson Streets, Defendant asked James to pull over so he could purchase something from a bodega on the corner. Defendant walked to the bodega and discovered that it was closed. As he was returning to the vehicle, he heard gunshots and saw people running towards him. Defendant stated that he then pulled out his own gun, which he was carrying illegally since he had a robbery conviction that rendered him ineligible to possess a firearm. Defendant testified that he began firing the gun at the people running towards him as he ran back to the car. He saw Officer Williams nearby in his police car so Defendant jumped in the Nissan and told James to "go, go, go." Defendant stated that he threw the gun at James and when James pulled the car over, he

11

jumped out and ran because he didn't want to get into trouble for having a firearm. He denied seeing Officer Mundrick parked behind them in an unmarked vehicle. Defendant testified that he ran into an alleyway and then into an abandoned house and hid in a second floor bedroom, where the police later found him. Defendant stated that he did not know at the time whether someone had been shot during the shoot out. He denied knowing anybody who lived on Frazier Street, including Johnson, Briggs, and Evans. Id. at 52-68, 137, 149-151.

At the conclusion of Defendant's testimony, counsel entered evidence by way of stipulation by and between counsel. Counsel stipulated that if the Clerk of Quarter Sessions were called to testify, she would state that Defendant was arrested on October 13, 2008 and charged with robbery, graded as a felony of the first degree—threatening immediate serious bodily injury, and that Defendant pled guilty to this charge on October 3, 2009. Id. at 156.

The jury found Defendant guilty of Third Degree Murder, VUFA § 6106, VUFA § 6108, PIC and fleeing or attempting to elude police.

## ISSUES

I.      WHETHER THIS COURT PROPERLY PERMITTED THE COMMONWEALTH TO QUESTION DEFENDANT REGARDING HIS PRE-ARREST SILENCE.

II.      WHETHER THE EVIDENCE WAS SUFFICIENT FOR THE JURY TO FIND DEFENDANT GUILTY OF THIRD DEGREE MURDER.

## DISCUSSION

I.      THIS COURT PROPERLY PERMITTED THE COMMONWEALTH TO QUESTION DEFENDANT REGARDING HIS PRE-ARREST SILENCE.

This Court properly permitted the Commonwealth to question Defendant regarding his pre-arrest silence since Defendant chose to testify at trial and waived his right to remain silent. In

12

his Statement of Errors, Defendant mischaracterizes the line of questioning as regarding "post-arrest silence." This claim is without merit.

The Fifth Amendment of the United States Constitution and Article 9 of the Pennsylvania Constitution protect a person from being compelled to be a witness against him or herself. U.S. Const. Amend. V; Pa. Const. Art. I, § 9. However, once a defendant decides to takes the stand and testify at trial, he waives his right against self-incrimination. Commonwealth v. Molina, 104 A.3d 430 (Pa. 2014). "His waiver is not partial; having once cast aside the cloak of immunity, he may not resume it at will, whenever cross-examination may be inconvenient or embarrassing." Molina, 104 A.3d at 447 (quoting Raffel v. U.S., 271 U.S. 494, 497, 46 S.Ct. 566, 70 L.Ed. 1054 (1926)). As the Pennsylvania Supreme Court underscored in Molina, "it would undermine the fundamental truth-seeking purpose of our adversary system to prevent the prosecution from questioning the validity of the defendant's testimony in an attempt to uncover fabricated defenses." 104 A.3d at 448. Thus, "the prosecution may impeach the testifying defendant with his prior statements, actions, or silence, regardless of whether the statements, actions, or silence occurred prior to or after the reading of Miranda rights or the defendant's arrest, if the defendant waives his right against self-incrimination by testifying." Id. The prosecution may not only use the defendant's silence for impeachment purposes, but also as fair response to a defendant's argument at trial. Id. It should be noted, however, that any reference to post-Miranda silence or statements may infringe upon the defendant's due process rights. Id. at 104 A.3d 447, n.16.

In Jenkins v. Anderson, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), a defendant on trial for first degree murder testified that he acted in self-defense. On cross-examination, the prosecutor sought to impeach the defendant's credibility by asking why the defendant did not report the incident to police and tell them he had acted in self-defense. The United States

13

Supreme Court held that the Fifth Amendment guarantees a defendant's right to remain silent and prevents the prosecutor from commenting on that silence; however, when a criminal defendant chooses to testify at trial, he waives that right and the prosecutor may cross-examine him and impeach his credibility just like any other witness.

Adopting the holding of Jenkins, in Commonwealth v. Bolus the Pennsylvania Supreme Court held that "when a criminal defendant waives his right to remain silent and testifies at his own trial, neither the United States nor the Pennsylvania Constitution prohibit a prosecutor from impeaching a defendant's credibility by referring to his pre-arrest silence." 545 Pa. 103, 113 (1996).

In Commonwealth v. Kuder, the defendant testified at trial that he believed the complainant had a weapon at the time of an intercepted conversation, wherein defendant did not deny allegations of sexual abuse, but rather expressed remorse and begged for forgiveness. He testified that he only made those statements because he feared for his safety. The Commonwealth questioned the defendant regarding his silence at the time the police arrived to arrest him, asking why didn't he tell the police that the complainant had a gun. The Pennsylvania Superior Court held that "[w]hen a defendant elects to testify, neither the right to remain silent nor due process principles are offended by a prosecutor's reference to that defendant's pre-arrest silence, when that reference is used to impeach the testifying defendant's credibility." 62 A.3d 1038, 1053 (Pa Super 2013). The court continued, stating that "[t]he Commonwealth attempted to impeach the credibility of [the defendant's] assertion by inquiring about [defendant's] silence at the time the police arrived. Per Bolus and Jenkins, this was fair impeachment."

In the case at bar, the Commonwealth properly attempted to impeach Defendant by asking him about his silence at the time the police discovered him hiding in the abandoned

14

house. Defendant had testified that he was a victim, not the instigator, and that people had begun shooting at him for no reason. He further testified that he shot in self-defense and then gave his gun to James after he jumped into the car. Like in Kuder, the Commonwealth asked Defendant why he didn't call 911 immediately or why he failed to approach the uniformed police officer he encountered if he was the victim of a crime. The Commonwealth further inquired about his silence at the time the police arrived at the abandoned house, asking why he didn't tell the police right away that people had been shooting at him or that James was not involved in the shooting:

| THE COMMONWEALTH: | Sir, my question is this: Even knowing that there was another man with you, Lanier James—and this is the last opportunity that you saw him. He had your gun -- when the police first reached you on the second floor of the abandoned home on Wanamaker Street, you didn't say to them, "The other guy's got nothing to do with this," did you, sir? |
|---|---|

(N.T. 5/26/15, p. 133-34). Defense counsel objected to this question, which this Court overruled. The Commonwealth then continued with this line of questioning:

| THE COMMONWEALTH: | You didn't say that other man has nothing to do with this, did you, sir? |
|---|---|
| DEFENDANT: | No. At that point when the abandoned house that I was at, I was immediately placed in handcuffs, and the only person that I felt comfortable talking about my whole ordeal with is my lawyer. |
| THE COMMONWEALTH: | Your answer is, no, you didn't tell them that there was another person with you who had nothing to do with this, did you, sir? |
| DEFENDANT: | No. |

Id. at 134-135. Per Bolus, Jenkins, and Kuder, this was fair impeachment as the Commonwealth was attempting to impeach Defendant's version of events by asking him about his pre-arrest silence when he encountered police officers.

Defendant argued that he was under arrest when the police found him in the abandoned house and therefore the Commonwealth improperly questioned him regarding his post-arrest silence. This claim is without merit. Pennsylvania Courts have recognized three levels of interaction between police and the public: mere encounters, investigative detentions, and arrests. Commonwealth v. Lyles, 54 A.3d 76, 79 (Pa. Super. 2012).

> The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or respond. The second, an "investigative detention" must be supported by reasonable suspicion; it subjects a suspect to a stop and period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

Id. (citing Commonwealth v. Phinn, 761 A.2d 176, 181 (Pa.Super. 2000)(quoting Commonwealth v. Ellis, 541 Pa. 285, 662 A.2d 1043, 1047 (1995)(citations and footnotes omitted)). In order to determine whether an encounter with police has risen to the level of an investigative detention, "the court must examine all of the circumstances and determine whether police action would have made a reasonable person believe he was not free to go and was subject to the officer's orders." Commonwealth v. Jones, 874 A.2d 108, 116 (Pa. Super. 2005) (quoting Commonwealth v. Stevenson, 832 A.2d 1123, 1127 (Pa.Super. 2003)). "To institute an investigative detention, an officer must have at least a reasonable suspicion that criminal activity is afoot. Reasonable suspicion requires a finding that based on the available facts, a person of reasonable caution would believe the intrusion was appropriate." Id. Pennsylvania courts have held that police officers may place handcuffs on individuals during investigative detentions for

16

the safety of police officers, and that this does not elevate the investigative detention to an arrest. Commonwealth v. Rosas, 875 A.2d 341, 348 (Pa.Super.2005)(citing Commonwealth v. Guillespie, A.2d 654, 660-661 (Pa.Super.2000)(holding "act of handcuffing suspects during investigatory detention "was merely part and parcel of ensuring the safe detaining of the individuals during the lawful Terry stop" and did not constitute an arrest)).

In the case at bar, Defendant was not immediately arrested when police found him hiding in the abandoned house. Rather, he was subjected to an investigative detention. The police had reasonable suspicion to detain Defendant as he matched the description of the shooter and was found hiding in an abandoned house in same area that Officer Mundrick had observed the suspected shooter jump out of a Nissan Maxima and run. At this point, Defendant was not under arrest, even though he was placed in handcuffs for the officers' safety. He was detained in the abandoned house for a short period of time until his identification as the passenger of the Nissan Maxima could be confirmed or dispelled. Indeed, Defendant was the second person who had been detained for Officer Mundrick to make an identification. As Officer Mundrick testified at trial, the first male detained by police was not the man he saw emerge from the Nissan Maxima; as a result, that man was released. (N.T. 5/20/15, p. 183). That man, like Defendant, was not placed under arrest immediately. Rather, the police held him for a short period so they could conduct their investigation, and then released him once it was confirmed that he was not involved in any criminal activity. Since Defendant was not under arrest during the time he waited at the abandoned house with police, questions regarding his pre-arrest silence were fair impeachment under Jenkins, Bolus, and Kuder. Accordingly, this Court committed no error and properly permitted the Commonwealth to inquire about Defendant's pre-arrest silence.

II.     THE EVIDENCE WAS SUFFICIENT FOR THE JURY TO FIND DEFENDANT GUILTY OF THIRD DEGREE MURDER.

17

The evidence adduced at trial was sufficient to support the jury's finding of guilt on the charge of third degree murder.

## A. Sufficiency of the evidence.

A review of the sufficiency of the evidence to support a conviction requires that the evidence be reviewed in the light most favorable to the Commonwealth as verdict winner. Commonwealth v. Levy, 2013 PA Super 331, 83 A.3d 457, 461 (2013) (quoting Commonwealth v. Williams, 871 A.2d 254, 259 (Pa.Super. 2005)). The Commonwealth is also entitled to all favorable inferences which may be drawn from the evidence. Commonwealth v. Kelly, 2013 PA Super 276, 78 A.3d 1136, 1139 (2013) (citing Commonwealth v. Hopkins, 67 A.3d 817, 820 (Pa.Super. 2013)). The evidence put forth by the Commonwealth will be considered sufficient if it establishes each material element of the crime beyond a reasonable doubt, even if by wholly circumstantial evidence. Commonwealth v. Franklin, 2013 PA Super 153, 69 A.3d 719, 722 (2013) (citing Commonwealth v. Brewer, 876 A.2d 1029, 1032 (2001)).

When determining whether the evidence is sufficient to support a guilty verdict, the appellate court must examine the entire trial record and consider all of the evidence actually received. Commonwealth v. Graham, 2013 PA Super 306, 81 A.3d 137, 142 (2013) (quoting Commonwealth v. Brown, 23 A.3d 544, 559-60 (Pa.Super 2011)). However, the trier of fact is entitled to believe all, part or none of the evidence received at trial and the appellate court cannot substitute its judgment for that of the fact-finder. Commonwealth v. Fabian, 2013 PA Super 6, 60 A.3d 146, 151 (2013) (quoting Commonwealth v. Jones, 886 A.2d 689, 704 (Pa.Super. 2005)). The facts and circumstances established by the Commonwealth need not eliminate any possibility of the defendant's innocence; rather, any doubt is to be resolved by the fact-finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact

could be concluded. <u>Commonwealth v. Stays</u>, 2013 PA Super 170, 70 A.3d 1256, 1266 (2013) (citing <u>Commonwealth v. Aguado</u>, 760 A.2d 1181, 1185 (Pa.Super. 2000)).

### B. Murder of the Third Degree.

Third degree murder is defined as all other types of murder that are not first degree or second degree murder. <u>Commonwealth v. Garland</u>, 63 A.3d 339, 345 (Pa. Super. 2013)(citing 18 Pa.C.S.A. §2502(c)). More specifically:

> Third degree murder occurs when a person commits a killing which is neither intentional nor committed during the perpetration of a felony, but contains the requisite malice. Malice is not merely ill-will but, rather, wickedness of disposition, hardness of heart, recklessness of consequences, and a mind regardless of social duty. Malice may be inferred from the use of a deadly weapon on a vital part of the victim's body. Further, malice may be inferred after considering the totality of the circumstances.

<u>Garland</u>, *supra* (quoting <u>Commonwealth v. Truong</u>, 36 A.3d 592, 597-98 (Pa.Super. 2012) (quotations, quotation marks, citations omitted).

In <u>Garland</u>, the jury properly found the defendant guilty of third degree murder where he and an accomplice approached a group of men talking on a front stoop, brandished firearms, and then fired multiple times at the men as they ran away. The <u>Garland</u> court held that the defendant showed malicious intent when he shot at the decedent as well as anyone else who was in the area, and that even if he didn't intend to kill anyone, he showed "recklessness for society and human life." 36 A.3d at 345.

In <u>Commonwealth v. Devine</u>, the jury properly found the defendant guilty of third degree murder where he and his friends, when confronted by an angry mob gathered outside of their

19

house, chose to arm themselves with firearms and confront the mob rather than call the police for assistance. The defendant and his friends began shooting into the crowd, killing one of the people gathered there. The court held that the defendant's actions showed "recklessness of consequences." 26 A.3d 1139, 1149 (Pa. Super. 2013).

In the case at bar, the evidence adduced at trial was sufficient to support Defendant's conviction of third degree murder. Officer Williams testified that heard gunshots and arrived on the scene while the shooting was in progress. He observed Defendant running and shooting at a black male running away from him. Aaron Johnson was shot once in the back and once in the hip, and died from those injuries. Officer Williams saw Defendant get into the front passenger seat of a maroon Nissan Maxima bearing out-of-state license plates and speed away. A few streets away, Officer Mundrick spotted Defendant and James exiting a maroon Nissan Maxima with Louisiana plates and chased James on foot. After placing James under arrest and retrieving a firearm from his waistband, Officer Mundrick was called to a nearby abandoned house, where police had found Defendant hiding in a second floor bedroom. Officer Mundrick positively identified Defendant as the front seat passenger from the Nissan Maxima. Forensic Scientist Scott Copeland testified that during his second review of the fingerprints recovered from inside the Nissan Maxima, he determined that one of the fingerprints matched Defendant's. Officer Gregory Walsh testified that all six of the fired .45 caliber cartridge casings recovered from the scene of the shooting matched the gun recovered from James. Defendant himself testified that he gave the gun to James when he got into the Nissan Maxima after shooting at the crowd of men. Moreover, the jury properly found requisite malicious intent as Defendant fired multiple shots at a crowd of people. As in Garland and Devine, shooting at a group of people on the street demonstrates a "recklessness of consequences" and a "recklessness for society and human life."

20

Defendant himself admitted to shooting randomly at a group of people. This evidence was sufficient to convict Defendant of third degree murder.

Defendant claims that the Commonwealth "failed to disprove the defendant's claim of self-defense beyond a reasonable doubt." Defendant did not fully flush out this claim in his Statement of Errors; however, it appears that he is claiming "imperfect self-defense," and believes that he should have been convicted of a lesser offense, such as unreasonable belief involuntary manslaughter. This claim is without merit.

Voluntary manslaughter—unreasonable belief killing justifiable—is defined as follows: "A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title, but his belief is unreasonable." 18 Pa.C.S.A. § 2503(b). "[T]he elements necessary to establish unreasonable belief voluntary manslaughter, which is sometimes loosely referred to as [']imperfect self-defense[']" require proof of "an unreasonable belief rather than a reasonable belief that deadly force was required to save the actor's life." Commonwealth v. Ventura, 975 A.2d 1128, 1143 (Pa.Super. 2009) (quoting Commonwealth v. Tilley, 528 Pa. 125, 141, 595 A.2d 575, 582 (1991)). "All other principles of justification under 18 Pa.C.S. § 505 must [still be met in order to establish] unreasonable belief voluntary manslaughter." Id. Section 505 (a) sets forth the elements of self-defense: "The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion. 18 Pa.C.S.A. § 505(a).20 "When a defendant raises the issue of self-defense, the Commonwealth bears the burden to disprove such a defense beyond a reasonable doubt." Ventura, 975 A.2d at 1143 (quoting Commonwealth v. Bullock, 948 A.2d

21

818, 824 (Pa.Super.2008)). The Commonwealth meets its burden of proof if it establishes at least one of the following: (1) the accused did not reasonably believe that he was in danger of death or serious bodily injury; (2) the accused provoked or continued the use of force; or (3) the accused had a duty to retreat and the retreat was possible with complete safety. Ventura, 975 A.2d at 1143 (citing Commonwealth v. McClendon, 874 A.2d 1223, 1230 (Pa.Super.2005)). The Commonwealth must prove only one of these elements beyond a reasonable doubt to sufficiently disprove a self-defense claim. Id. (citing Commonwealth v. Burns, 765 A.2d 1144, 1149 (Pa.Super.2000)).

Here, the Commonwealth sufficiently disproved Defendant's self-defense claim. Other than Defendant's own self-serving version of events, there was no evidence presented that showed Defendant was attacked, provoked or threatened. Defendant testified at trial that he shot at the group of men "in self-defense," arguing that shots were fired at him first and that he did not intend to kill anyone. He testified that he was attempting to enter a corner store, when he heard gunfire. In response, he pulled out his own weapon and began to fire at a group of people running towards him. Defendant testified that he did not know whether he shot anyone and that he ran away and hid because he knew he was not supposed to be carrying a firearm as a convicted felon. Clearly, the jury did not find Defendant's version of events to be credible. Several witnesses who were outside with decedent Aaron Johnson the morning of the shooting testified that Johnson, who was sitting on a bicycle, and the other men gathered on the porch were smoking marijuana and talking about sports when they heard gunfire. Anthony Evans described the gunmen as "black males with black hoodies." Officer Williams, who heard the gunshots himself and arrived on the scene while the shooting was still in progress, testified that he saw **Defendant running and shooting at a black male who was running away from him.**

22

The medical examiner testified that Johnson was shot once in the back and once in the hip, clearly refuting Defendant's story that he was shooting at armed gunmen running towards him. Based upon this evidence, the Commonwealth met its burden and proved that Defendant did not reasonably believe himself to be in danger of death or serious bodily injury. Accordingly, this Court's judgment of sentence should be affirmed.

## CONCLUSION

After reviewing the applicable statutes, testimony and case law, this Court committed no error. This Court properly permitted the Commonwealth to question Defendant regarding his pre-arrest silence inside the abandoned house. In addition, the evidence was sufficient for the jury to find Defendant guilty of third degree murder. Last, this Court agrees that the jury's finding of guilt on the charge of Fleeing or Eluding Police Officer should be vacated as Defendant was not the driver of the vehicle and the evidence adduced at trial was insufficient to convict him of this crime.

BY THE COURT:

_____ J.

24